DANNY EARL JOHNSON, a Minor, by His Mother and Next Friend, Louise Mason, Plaintiff-Appellant, *v.* CHICAGO TRANSIT AUTHORITY, Defendant-Appellee.

(No. 58714;

First District (2nd Division)—May 13, 1975.

Rotman & Elovitz, of Chicago (Dom J. Rizzi and Jack R. Pine, of counsel), for appellant.

Francis J. Mullen, John J. O'Toole, and Richard T. Ryan, all of Chicago, for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

This action was brought to recover damages for personal injuries occasioned by the alleged negligence of the defendant, Chicago Transit Authority, (hereinafter "C.T.A.") in the operation of one of its vehicles. The jury returned a verdict for the plaintiff in the amount of $30,000 and judgment was entered thereon. Defendant filed a post-trial motion *inter alia* for a new trial which was granted by the trial court. Plaintiff then filed a petition for leave to appeal which was allowed in this court. The sole question on appeal is whether the trial court's action in granting defendant's motion for a new trial constituted an abuse of judicial discretion. The facts, in relevant part, follow.

The only evidence that was offered on behalf of the plaintiff on the question of liability was the testimony of the plaintiff himself. Plaintiff, a

C.T.A. employee at the time, stated that he was injured when he was struck by a C.T.A. bus on July 16, 1968, between 12 and 1 A.M. The occurrence took place outside the C.T.A. terminal at 69th and Ashland Avenue, Chicago. The terminal covers an area from 69th Street south to 71st Street on the west side of Ashland Avenue. There is a cyclone fence around the area with various gates for ingress and egress of busses and personnel.

According to plaintiff, he started working on July 15 at his regular starting time of 11 P.M. He was working between 70th and 71st Street where the filling area for putting propane fuel in the busses is located. Between 12 and 1 A.M. on July 16, he went on his coffee break. He left the propane fuel filling area and walked through the bay area to 69th Street where a coffee shop is located on the northwest corner of 69th and Ashland Avenue. When he reached the coffee shop, he realized that he had left his money in his pants that were in his locker. Since it was a hot night he decided not to walk back through the bay area, but he decided to walk outside down Ashland Avenue. He proceeded south on the west side of Ashland to 71st Street. At 71st Street, he turned west on the public sidewalk on the north side of 71st Street. The walk is approximately 7 feet wide, and the C.T.A. fence is located on the north edge of the walk.

There are two entrances into the C.T.A. property on 71st Street. Plaintiff found that the first entrance was filled with busses and decided to proceed to the second entrance. The second entrance gate was open, presenting a 50- to 60-foot opening in the fence. Just as he started to make the turn into the second entrance, he heard the sound of air brakes, a sound familiar to him from working at the C.T.A. He turned to his left and saw a C.T.A. bus coming "pretty fast" and without any lights. When he first saw the bus, the front end was just starting through the gate. He stopped clear of the bus to allow it to complete its turn, but all of a sudden the bus started to turn sharply right. He attempted to back away, but before he could do so, the right rear portion between the back door and the back wheel struck him knocking him to the ground.

After being knocked down by the bus, he was unable to move his legs. He called for help for some time, but no one came. Fearing to lie in the driveway because other busses might strike him, he dragged himself out onto 71st Street in an attempt to get into a lighted area. He did not attempt to drag himself into the terminal area because it was dark. In the middle of the street, he began to call again and finally some C.T.A. employees came to his aid. He was taken to the emergency room at Holy Cross Hospital in a fire ambulance. As a result of the occurrence, plaintiff suffered fractures of the right inferior and superior pubic rami and right hip joint.

Chester Kmiec testified on behalf of defendant. He stated that on July 16, 1968, sometime after midnight, he had occasion to witness an accident on 71st Street near Ashland Avenue. At the time, he was positioned on the C.T.A. property near the south end of the gate on 71st Street. He observed a person, who had been riding a bicycle within the barn area, ride out of the gate, turning east on the north side of 71st Street. A bus made a right turn off of Ashland Avenue onto 71st Street going west, and the bike and the bus collided. After the collision, the person who was driving the bus pulled it part way into the entrance, stopped, and ran off into the yard. The witness did not see who was riding the bicycle and, consequently, did not know if plaintiff was involved in the occurrence which he had witnessed. However, he did state that the person who had been riding the bicycle was taken away in a fire ambulance, and that he was present at the scene for two or three hours prior to the occurrence and did not witness any other accident.

On cross-examination, it was established that the witness was not employed by the C.T.A. at the time of the occurrence, but went to the bus terminal at 9 P.M. on July 15 to visit his friend, George Sepekus. Sepekus was employed by the C.T.A. and on that particular day was sweeping out busses. The witness remained and talked to Sepekus for 2 hours, and then accompanied him to sweep out a bus. After they had finished cleaning the bus, they stood by the gate for an hour or so and talked. It was at this time that the incident occurred.

After the incident, the witness gave his name to a person who was at the scene; he did not know the identity of the person to whom he gave his name or whether he was a C.T.A. employee. There were other people in the area at the time, some of whom he knew to be C.T.A. employees. He didn't observe anyone take the bicycle away, and left immediately after the fire ambulance departed. From the date of the occurrence until a week before trial, no one had ever contacted him about the case.

Police Officer Ciaccio testified that on July 16, 1968, sometime after midnight, he investigated an accident at 71st and Ashland. By the time he had arrived at the scene, the injured party, Danny Johnson, had already been removed by a fire ambulance. He had no personal knowledge of how the occurrence took place, did not learn who had operated the bus involved, and did not obtain the name of any witnesses. There were some people at the scene, but none of them had viewed the incident at the time of impact. He found no vehicle at the scene except for defendant's bus. The bus did not bear any markings of being in an accident.

Regis Miller testified that he is a garage instructor for the C.T.A. and that on the night in question was assigned to the 69th Street garage.

He did not witness the accident, but arrived at the scene shortly there-after and found Johnson lying on 71st Street about 25 feet west of Ashland. Earlier that night, he had seen a bicycle in the garage which he never saw again. He had no knowledge of what happened to the bicycle and did not see it at the scene of the accident.

Before resting, the defense introduced into evidence the following paragraph of the original complaint filed on behalf of Danny Johnson:

"That on the 16th day of July, 1968, the plaintiff, Danny Earl Johnson, was a pedestrian crossing Ashland Avenue at or near where the same intersects 71st Street from east to the west in the north crosswalk of Ashland Avenue in the City of Chicago."

In rebuttal, plaintiff offered the testimony of Spencer Schwartz, the attorney who drafted the original complaint in the suit. He stated that he took over the files of a deceased attorney, Allan Goodman, in February of 1969. Among the files was that of Danny Johnson's. There were no pleadings in the file, but merely some sketchy notes. Based on these notes, he drafted the original complaint without discussing the occurrence with plaintiff. After conferring with plaintiff, he drafted and filed an amended complaint in September of 1969.

■■ The granting of a new trial, while discretionary with the trial court, is nevertheless subject to review. (*Redmond v. City of Chicago*, 10 Ill.App.3d 567, 294 N.E.2d 761.) In reviewing the exercise of that discretion where no procedural errors are alleged, the applicable standard is whether the jury's verdict was contrary to the weight of the evidence. (*Doerr v. Palm*, 1 Ill.App.3d 902, 274 N.E.2d 889.) In applying the standard of review, we are guided by the following principles set forth in *Biel v. Wolff*, 126 Ill.App.2d 209, 224-225, 261 N.E.2d 474:

"In passing on a motion for a new trial the trial court has a greater latitude in passing on questions of fact than on questions of law, and we will not reverse its ruling on a question of fact unless a clear abuse of discretion is shown. Hulke v. International Mfg. Co., 14 Ill.App.2d 5, 142 N.E.2d 717. However, this discretion is not unlimited and must be reasonably exercised, and the trial court cannot interfere with the jury's verdict unless it can say that it is contrary to the preponderance or weight of the evidence, though the court might have decided differently. Jonkman v. Singletary, 10 Ill.App.2d 335, 134 N.E.2d 671. In Finley v. New York Cent. R. Co., 19 Ill.2d 428, 167 N.E.2d 212, at page 436:

'The fact that contrary inferences would be equally supported by the evidence is not sufficient to show unreasonableness of the verdict. It is the jury's function to weigh contradictory evi-

dence, judge the credibility of the witnesses and draw the ultimate conclusion as to the facts. Its conclusion, whether relating to negligence, causation, or any other factual matter should not be set aside merely because different conclusions could be drawn or because judges feel that other results are more reasonable.' "

■■ Plaintiff's testimony in the present case provided a sufficient evidentiary basis to prove a prima facie case and to support a verdict in favor of plaintiff. Likewise, from the evidence adduced by the defense, a jury could reasonably infer that plaintiff was not injured in the manner to which he testified. While the defense testimony certainly raised the questions of credibility and probability, there was nothing so conclusive or compelling in its presentation which would warrant a disregard of the jury's verdict. In evaluating the respective theories of the case, it was within the province of the jury to believe plaintiff's testimony and to query the evidence submitted by defendant. Although Kmiec's testimony was clearly the supportive basis of the defense theory, the jury may have been troubled by the fact that Kmiec could not say that the person whom he saw riding the bicycle was Johnson. The jury may have wondered why the witness Kmiec surfaced, for the first time, 1 week before trial, or why no bicycle was found at the scene.

■■ Notwithstanding the above, it is equally clear from the colloquy between court and counsel on defendant's motion for a new trial, that the trial judge chose to draw his own inferences from the evidence adduced by defendant and to disbelieve the testimony of plaintiff. This, in the proper exercise of his discretion, the trial judge could not do. As stated in *Dailey v. Hill*, 99 Ill.App.2d 474, 479, 241 N.E.2d 683:

"Defendant was entitled to have these questions of fact decided by the jury, and it is irrelevant that the judge might have decided the case differently, based on his own evaluation of the testimony. Determination of the weight to be accorded conflicting testimony, the drawing of inferences from the evidence, and resolving issues of fact as negligence are preeminently matters for the jury and not for the judge. In the proper exercise of his discretion a judge may not set aside a verdict and grant a new trial unless it is clear that the verdict resulted from passion or prejudice or is wholly unwarranted by the evidence."

■■■ Litigation necessarily presents disputed issues; when the issues are factual, the burden of weighing the conflicts and discrepancies in the evidence, of determining whose testimony is credible in whole or in part, and of drawing the ultimate conclusions of fact, falls upon the trier of fact.

Viewing the entire record at bar, the inferences and conclusions drawn by the jury are supported by the weight of the evidence. Accordingly, the trial court erred in granting a new trial.

The cause is reversed and remanded to the circuit court with directions to enter judgment on the verdict.

Reversed and remanded with directions.

DOWNING, P. J., and LEIGHTON, J., concur.