JOHN T. BURNS et al., Plaintiffs-Appellees, v. THE REGIONAL TRANS-PORTATION AUTHORITY et al., Defendants-Appellants.

First District (5th Division)   No. 82—0772

Opinion filed December 30, 1982.—Rehearing denied February 8, 1983.

Jeremiah Marsh, Michael Schneiderman, Michael M. Conway, and John L. Rogers, III, all of Hopkins & Sutter, of Chicago (Carl J. Frank, General

Counsel of the Regional Transportation Authority, of counsel), for appellant Regional Transportation Authority.

John O. Demaret, Ronald F. Bartkowicz, and Jean M. Golden, all of Chicago, for appellant Chicago Transit Authority.

Ray G. Rezner, W. Scott Porterfield, and Jonathan D. Moses, all of Fishman, Merrick & Perlman, P.C., of Chicago (Julius V. Padegimas, Keefe & Ehemann Law Center, Ltd., McCarron & Carroll, Michael Closen, and Miles Hartman, Ltd., of counsel), for appellees.

JUSTICE WILSON delivered the opinion of the court:

This action consolidates six complaints filed by persons who purchased July 1981 monthly passes from the Chicago Transit Authority (CTA) to contest ordinances of the CTA and Regional Transportation Authority (RTA) whereby transit fare increases affected July monthly pass holders. Plaintiffs contend that their monthly passes were contracts which entitled them, in all events and regardless of intervening fare increases, to unlimited use of CTA service for the month of July at the original price charged for their passes.

On November 7, 1979, the Chicago Transit Board (the governing body of the CTA) passed an ordinance authorizing the sale of monthly transportation passes in the Chicago metropolitan area. Purchasers of the monthly passes received unlimited services on the CTA facilities for the appropriate month upon presentation of a pass.

The public was encouraged to purchase monthly passes through a variety of advertising media including television, radio and printed circulars which touted the monthly pass for its convenience. The public was told that all purchasers of passes would be entitled to unlimited ridership for that month without the bother of needing correct change or a transfer. A pamphlet entitled "CTA Monthly Pass" contained a typical description of the benefits of owning a monthly pass. The pamphlet read in part as follows:

> "Congratulations on receiving your CTA Monthly Pass. You now have unlimited riding privileges on the CTA for the entire month for which your pass has been issued. Correct change is unnecessary and you won't have to buy a transfer—you'll just show your Pass!"

CTA monthly passes were sold for approximately one year, when in December 1980, as the result of a financial crisis, defendants authorized a series of fare increases. The price of a CTA monthly pass thereafter rose from $30 to $35.. The following summer (1981),

defendants' fiscal problems had still not yet been resolved and in order to avoid system shutdowns, additional fare increases were implemented as well as service cutbacks.

On July 1, 1981, the Chicago Transit Board enacted Ordinance No. 81—88, which increased rates for service on the CTA by 12.5%. The ordinance read in part as follows:

"Ordinance No. 81—88

BE IT ORDAINED BY CHICAGO TRANSIT BOARD OF CHICAGO TRANSIT AUTHORITY:

Basic fare will be ninety cents ($0.90)
    plus ten cents ($0.10) for a transfer;
Reduced fares will be forty cents ($0.40),
    plus ten cents ($0.10) for a transfer;
Premium rates for express service shall
    be ten cents ($0.10) additional;
Monthly passes shall be sold at a charge
    of forty dollars ($40.00);
Packets of ten (10) tokens shall be sold
    at a discounted price."

On July 2, 1981, the RTA enacted Ordinance No. 81—179 which, in effect, adopted the CTA's 12.5% rate increase and which authorized the imposition of a surcharge.

CTA fare increases became effective July 6, 1981.

Between June 26 and July 1, 1981, plaintiffs (as well as hundreds of other persons) purchased July monthly passes for $35. They received unlimited service on the CTA's facilities from July 1 through July 5 upon presentation of their passes. When the price hike became effective on July 6, 1981, however, defendants sold daily and monthly tickets to riders at the increased fares and they began collecting a 10-cent-per-ride surcharge from plaintiffs as well as all other holders of July monthly passes who had purchased passes for $35. Each plaintiff had to pay a 10-cent surcharge each time he rode the CTA from July 6 through July 31, 1981, in addition to showing his monthly pass, or else be denied access to CTA facilities.

A number of class action lawsuits were immediately filed in the circuit court of Cook County against the CTA and RTA challenging the imposition of the surcharge against July monthly pass holders. In some cases, injunctions or restraining orders were sought to ban collection of the surcharge. All of these requests were denied. The remaining cases were consolidated and a plaintiff class, representing all July pass holders who purchased July passes prior to July 6, 1981, was organized.

Plaintiffs filed an amended consolidated complaint for all cases which had been consolidated. Count I alleged that defendants had breached the contract they had with July monthly pass holders by imposing a per-ride surcharge. Count II alleged, in the alternative, that if the RTA was not a party to the contract, it had tortiously interfered with the contract between the CTA and July monthly pass holders.

The trial court granted plaintiffs' motion for partial summary judgment on count I, the issue of liability. Plaintiffs' motion for summary judgment on count II was denied. The RTA's motion for summary judgment on count II was granted on the ground that the RTA was a party to the contract with July pass holders and therefore could not have tortiously interfered with its own contract. The court also certified the following issue of law pursuant to Illinois Supreme Court Rule 308 (87 Ill. 2d R. 308):

> "Did plaintiffs have a contract with the Chicago Transit Authority or the Regional Transportation or the Regional Transportation Authority or both as a result of their purchase of July CTA monthly passes prior to July 6, 1981, which contract was breached by the imposition of a per ride surcharge from July 6 to July 31, 1981, following enactment of ordinances by the CTA and RTA imposing general fee increases effective July 6, 1981, so as to entitle plaintiffs to entry of partial summary judgment on the issue of liability on Count I."

We find that a contract did exist between plaintiffs and both defendants but that it was not breached because of defendants' statutory power to establish transit routes and fares. We reverse.

OPINION

The rule in Illinois is that a contractual relationship between passenger and carrier begins when the passenger has presented himself at the proper place to be transported with the intention of becoming a passenger and is then either expressly or impliedly accepted by the carrier for transportation. (*Chicago & Eastern Illinois R.R. Co. v. Jennings* (1901), 190 Ill. 478, 60 N.E. 818.) Although it is not necessary that fare should have been paid or that the person have a ticket (*Illinois Central R.R. Co. v. O'Keefe* (1897), 168 Ill. 115, 48 N.E. 294), the person must put himself in the care of the carrier or directly within its control with the *bona fide* intention of becoming a passenger. He may manifest his intention by being at the place provided for passengers by the carrier, such as the waiting room or platform at the station (*Chicago & Eastern Illinois R.R. Co.*) or by simply moving to-

ward the carrier's vehicle in order to board. (*Katamay v. Chicago Transit Authority* (1972), 53 Ill. 2d 27, 289 N.E. 2d 623.) Since a carrier owes a duty of protection to its passengers, the circumstances must be such that the carrier will understand that such a person is a passenger in its care and entitled to its protection. *Chicago & Eastern Illinois R.R. Co.*

■ A contract arises, therefore, through an offer by a person to be carried, followed by an express or implied acceptance by the transportation facility to carry the person to an agreed upon destination for the current fare. *O'Donnell v. Chicago & Northwestern Ry. Co.* (1903), 106 Ill. App. 287.

■ Applying this rule to the facts before us in the instant case, we find that a contract of transportation clearly existed between plaintiffs and defendants. Plaintiffs offered themselves to be carried on defendants' bus lines—they purchased a monthly pass from the CTA and put themselves into the CTA's care and control. The CTA accepted plaintiffs' offer by granting them unlimited service on its transportation facilities upon presentation of a July monthly pass between July 1 and July 5, 1981. Plaintiffs thereby became passengers and, as a matter of law, a contract of carriage was established. See *Chicago & Eastern Illinois R.R. Co. v. Jennings* (1901), 190 Ill. 478, 60 N.E. 818, and *O'Donnell*, where the Illinois supreme and appellate courts held that what facts will create a contractual relation of carrier and passenger is a question of law.

■ We further find that plaintiffs entered a contractual relationship with both the CTA and RTA. The RTA is statutorily authorized to enter into financial grant agreements with the CTA and has a corresponding authority to determine fares under the Regional Transportation Authority Act. (Ill. Rev Stat. 1981, ch. 111⅔, par. 701.01 *et seq.*) The RTA Act further provides that the setting of fares is a precondition for any transportation agency, including the CTA, to receive RTA funding. The RTA is therefore the single authority responsible for mass transit in a six-county region in northern Illinois. *Regional Transportation Authority v. Burlington Northern Inc.* (1981), 100 Ill. App. 3d 779, 426 N.E.2d 1143.

The CTA is a unit of local government created pursuant to the provisions of the Metropolitan Transit Authority Act (Ill. Rev. Stat. 1981, ch. 111⅔, par. 301 *et seq.*). It is responsible for operating a mass transit system in Cook County (*Lustfield v. Chicago Transit Authority* (1951), 408 Ill. 404, 97 N.E.2d 347) and is the recipient of grants from the RTA. The Chicago Transit Board is responsible for creating and implementing fares. Ill. Rev. Stat. 1981, ch. 111⅔, par. 330.

Since a CTA ticket holder is subject to the authority of *both* transit authorities to alter fares and schedules, we find that a contractual relationship arises between all three parties: the RTA, the CTA and the passenger.

In its argument that a contract did not exist between plaintiffs and defendants, the CTA attempts to restrict the meaning of the term "contract of carriage." The CTA contends that this term is used by the courts only in reference to a carrier's liability for a passenger's *personal injuries or death*. The CTA further contends that the term "contract of carriage" is inapplicable to the case at bar since the issue raised on appeal deals with an alleged *breach of contract for transit fare*.

■ We disagree with the CTA's argument. The phrase "contract of carriage" may be used not only in relation to the liability of a carrier for personal injury or death of a passenger as a result of its failure to properly perform its duties to receive and transport such passenger, but the term encompasses *all* rights, liabilities and duties of the carrier and the passenger as well. Indeed, this contract is essential to the creation of the relationship of carrier and passenger. (*Illinois Central R.R. Co. v. O'Keefe* (1897), 168 Ill. 115, 48 N.E. 294.) We therefore give the phrase "contract of carriage" a broader interpretation than defendant CTA allows. Our reading of the controlling cases on this issue leads us to affirm over 75 years of Illinois case law which affirmatively characterizes the relation between a passenger and carrier as contractual. (*O'Donnell v. Chicago & Northwestern Ry. Co.* (1903), 106 Ill. App. 287.) We hold that this relationship exists in the case at bar.

Next for our consideration is whether the mere purchase of a CTA monthly pass gives rise to a contractual relationship between plaintiffs and defendants. We hold that it does not.

■ In accordance with our analysis above that in order to create a passenger-carrier relationship, a passenger must first make an offer to be carried, that he must put himself in the care and control of the carrier with the intention of becoming a passenger and that the carrier may show his acceptance by receiving the passenger and transporting him over its lines, it naturally follows that merely purchasing a ticket does not in and of itself create a contract of carriage. *O'Donnell v. Chicago & Northwestern Ry. Co.* (1903), 106 Ill. App. 287; *Chicago & Eastern Illinois R.R. Co. v. Jennings* (1901), 190 Ill. 478, 60 N.E. 818; *Illinois Central R.R. Co. v. O'Keefe* (1897), 168 Ill. 115, 48 N.E. 294.

Our courts have consistently held that a ticket (which, in the

pending case is in the form of a monthly pass) forms a part of the contract of carriage but it is not itself a contract. *Chicago & Alton R.R. Co. v. Dumser* (1896), 161 Ill. 190, 43 N.E. 698; *Illinois Central R.R. Co. v. Copeland* (1860), 24 Ill. 332.

A monthly pass, like a single-ride ticket, is a receipt which reflects prepayment of the current fare and is subject to the statutory powers and obligations of the carrier (CTA and RTA). *Lust v. Metropolitan West Side Elevated Ry. Co.* (1921), 222 Ill. App. 288.

In *Lust*, a passenger had purchased a ticket from the railroad at the then current fare of six cents. The ticket bore the words "good for one fare" on its face. Prior to the passenger's presenting the ticket for travel, the railroad raised its fare another two cents pursuant to authorization from the Illinois Public Utilities Commission. When the passenger sought to tender the ticket for transportation, the railroad refused to accept it without payment of an additional two cents. The court held that the presentation of the ticket subsequent to the fare increase was *not* a tender of the established fare for carriage. The court stated:

> " 'The settled opinion is, that a passage ticket, in the ordinary form, is merely a voucher, token or receipt, adopted for convenience, to show that the passenger has paid his fare from one place to another, and does not constitute the contract of carriage ***.' " 222 Ill. App. 288, 293.

We are in agreement with the *Lust* decision as well as earlier cases which have held similarly. *Chicago & Alton R.R. Co. v. Dumser* (1896), 161 Ill. 190, 43 N.E. 689; *Illinois Central R.R. Co. v. Copeland* (1860), 24 Ill. 332.

We next turn to the terms of the contract between plaintiffs and defendants. The issue here is whether the contractual terms were breached as a result of defendants' demand for a ten-cent surcharge. We hold that the terms were not breached because of defendants' statutory grant of authority to alter fares.

Plaintiffs contend that under the terms of the contract, defendants were obligated to provide unlimited transportation service to plaintiffs for the month of July 1981 at the price plaintiffs paid, which was $35. Plaintiffs further contend that their purchase of a July pass before July 5, 1981, entitled them to an exemption from the rate increase and subsequent ten-cent-per-ride surcharge.

Plaintiffs argue further that the CTA's promotion of the rights of a potential pass holder on television, radio and in newspapers, which informed the public that the monthly pass would be sold for $35, were "offers to buy" and that after plaintiffs accepted defendants' "offer"

472

the CTA was obligated to provide unlimited rides at that price. To support their argument, plaintiffs cite *Lust v. Metropolitan West Side Elevated Ry. Co.* (1921), 222 Ill. App. 288, for the proposition that the terms of a contract between carrier and passenger can be proven by parol evidence. By applying parol evidence rules, plaintiffs contend that defendants' "offers" became part of the contract of carriage and that this contract was breached by the demand for a ten-cent surcharge.

■ We disagree with plaintiffs' argument for two essential reasons. (1) Although it would appear that defendants' advertisements were solicitations to purchase monthly passes, we are unable to characterize them as "offers." They were merely promotions of a municipal service to the public. As we have stated earlier in this opinion, a contractual relation between carrier and passenger is established by a passenger's offer to be carried, followed by an acceptance by the carrier. (*O'Donnell v. Chicago & Northwestern Ry. Co.* (1903), 106 Ill. App. 287.) (2) Since defendants did not breach the contract with plaintiffs merely by the imposition of a per-ride surcharge, plaintiffs were not entitled to unlimited service without paying a ten-cent-per-ride surcharge.

Our finding on this issue is supported by Illinois case law which holds that laws and ordinances existing at the time a contract is entered into which affect its validity, construction or enforcement enter into and form a part of the contract. *Bethel Terrace, Inc. v. Village of Caseyville* (1976), 43 Ill. App. 3d 276, 356 N.E. 1269; *Archibald v. Board of Education* (1958), 19 Ill. App. 2d 554, 154 N.E.2d 867. See also *Burn v. Chicago, Burlington & Quincy Ry. Co.* (1910), 153 Ill. App. 319, which held that a prospective passenger purchases a ticket from a carrier subject to all laws and regulations which may be imposed on or by that carrier, and *Stine v. Chicago Transit Authority* (1973), 13 Ill. App. 3d 219, 300 N.E.2d 548, which recognized the discretion of the CTA to alter its operating structure without prior notice.

■ Therefore, although plaintiffs paid for their July passes according to the then current fare, the laws existing at the time plainly provided that the fare schedule could be changed. (Ill. Rev. Stat. 1981, ch. 111⅔, par. 701.01 *et seq.*; Ill. Rev. Stat. 1981, ch. 111⅔, par. 330.) Plaintiffs thus purchased their passes subject to the possibility of an increased charge for the use of public transportation.

That plaintiffs purchased their monthly tickets subject to defendants' power to increase the fare is also supported by the *Lust* decision. (*Lust v. Metropolitan West Side Elevated Ry. Co.* (1921), 222 Ill.

App. 288.) The *Lust* court upheld the statutory authority of the Public Utilities Commission to enact a fare hike despite the fact that the plaintiff in that case purchased a ticket prior to the increase. The court stated:

> "All public service contracts of this character are made with an implied provision that the rate is subject to change according to law and subject to the power of the State through its lawfully created agencies to change the rate in the future." 222 Ill. App. 288, 294.

*Lust* supports our position that a contract cannot fetter a carrier's exercise of its statutory rights. We therefore hold that plaintiffs bought their passes subject to the implied provision that the CTA's fare structure was subject to change.

Further support for our holding that defendants properly used their authority to alter the fare schedules can be found in *Hite v. Cincinnati, Indianapolis & Western R.R. Co.* (1918), 284 Ill. 297, 119 N.E. 904.

The court's rationale in *Hite* is applicable to the case at bar. Plaintiff Hite conveyed a parcel of land to a railroad in exchange for free transportation for him, his wife and their son during their natural lives. Free passes were provided pursuant to this contract from 1880 until 1915. In 1916, the railroad refused to issue any further passes, claiming that the Illinois Public Utilities Act required a uniform fare structure and prohibited the railroad from accepting compensation not provided for in the Commission's rate schedule.

Hite argued that the Act as applied to his agreement with the railroad violated his constitutional right to be free from laws which impair the obligations of contracts. The court rejected this contention and held:

> "All contracts, whether made by the State itself, by municipal corporations or by individuals, are subject to be interfered with or otherwise affected by subsequent statutes enacted in the *bona fide* exercise of the police power, and do not, by reason of the contracts clause of the Federal constitution, enjoy any immunity from such legislation. *** The condition contained in this deed was therefore subject to such regulation as might thereafter be made by the State in the exercise of its police power. *Appellant dealt with the railroad company knowing that it was a public utility and that any contract made with it relating to its service was subject to alteration or abrogation by the State in its exercise of that police power.*" (Emphasis added.) 284 Ill. 297, 299-300.

The court further held that because Hite had contracted for his lifetime pass subject to the power of the State to alter its fares, he no longer had the right to free transportation. 284 Ill. 297, 300.

Recent Illinois case law also affirms the discretionary power of the CTA and RTA to change the rates charged for transportation services. Our supreme court treated such a situation in *Board of Education v. Chicago Teachers Union, Local 1* (1981), 88 Ill. 2d 63, 430 N.E.2d 1111. In that case, the teachers union sued for breach of contract, alleging that the board of education's decision to close the schools one day early in order to save $2.8 million in teachers' salaries violated its collective bargaining agreement. The Illinois Supreme Court held that when a legislatively created agency is given discretionary authority, the terms of any contract with that agency are subject to those discretionary powers. The court stated:

"Just as the board has discretionary power, derived from the Code, to terminate employees *** the Code empowers the Board to control budgetary considerations ***. *** [T]he Board's powers here are discretionary unto itself and may not be delegated. ***.
* * *

In this case, any terms relating to the length of the school term in the collective bargaining agreement were subject to the Board's statutory power to close the schools early. Inasmuch as closing the Chicago public schools one day early was effected in compliance with provisions of the Code, that action was a lawful exercise of the Board's discretionary power." 88 Ill. 2d 63, 72-73.

The court concluded that the section of the School Code which granted the Board discretionary power to set an earlier closing date should be read into the union contract. 88 Ill. 2d 63, 73.

The Illinois Supreme Court's reasoning in *Board of Education* and *Hite v. Cincinnati, Indianapolis & Western R.R. Co.* (1918), 284 Ill. 297, 119 N.E. 904, is applicable to the pending case in that like the school board of *Board of Education* and like the railroad in *Hite*, the CTA and RTA have the discretion to alter a contract for services. This contract must therefore yield to the defendants' power to unarbitrarily charge a different fare than the one requested when the ticket was issued. Plaintiffs' argument on this point therefore fails.

In denying that plaintiffs are entitled to damages, we do not imply that the acts of the CTA and RTA may never be subject to legal challenge. This was discussed in *Stine v. Chicago Transit Authority* (1973), 13 Ill. App. 3d 219, 300 N.E.2d 548, where the court rejected

the plaintiffs' claims to a proprietary interest in the CTA's service. The court stated:

> "This does not mean, however, that persons who may consider themselves aggrieved by ordinances of the Board are without remedy or recourse. On the contrary, the courts have power to protect all persons against oppressive, arbitrary or unreasonable ordinances; precisely as in the case of any other municipal corporation." 13 Ill. App. 3d 219, 224.

■ The court system affords plaintiffs and all other aggrieved parties an opportunity to contest a municipal agency's actions. In the case at bar, plaintiffs pursued their grievance through the proper legal channels; however, we find their argument that they should have been immune from paying a surcharge to be without merit. Defendants' imposition of a ten-cent surcharge was not arbitrary or unreasonable and must be upheld. The RTA had lost important sources of local revenue, including a motor fuel sales tax, a public transportation fund supported by sales taxes and vehicle taxes, in addition to grants the State formerly made to the RTA's carrier to support reduced fares for the elderly and students. As a result of this financial drain, the RTA was having difficulty in meeting increased operating costs that were hastened by a national price inflation. In addition, it owed carriers within the RTA region over $90 million. Under these circumstances, it had no alternative but to curtail service, shut down certain lines and raise fares. On several occasions during the last six months of 1980 the RTA publicly announced that without additional finances, mass transit operation would cease. We therefore conclude that defendants' rate increase and the resulting surcharge that were implemented in order to offset continuing cost increases were justified.

We are aware of the fact that there is an element of unfairness here. When a carrier raises its fares, the person who purchased his ticket before the increase is, in effect, "stuck." He is forced to submit to the increase if he wants to be a passenger. Nonetheless, we are constrained to conclude as we do. Illinois law as cited in *Lust, Hite* and *Board of Education* is clear: a contract between a public carrier and a ticketholder has an implied term that the fare is subject to change by the public agency which is statutorily charged with regulating fares. As a result, users of mass transit in Illinois, such as plaintiffs, have no contractual right to maintenance of fares at any specific level. Defendants' authority to supersede previously issued fare passes, either by invalidating those passes purchased at lower rates or by requiring payment of additional charges, has been settled for more than 60 years. Defendants' authority is the manifestation of the public

policy which allows governmental bodies to act freely in exercising the discretion granted to them by law.

For our final consideration is the issue of whether defendants' surcharge was prospective or retroactive. We find that the surcharge was prospective. As held by the *Lust* court:

> "Appellee does contend, however, that the Public Utilities Commission had *no power to enact any rule or order impairing the validity of an existing contract.* \* \* \*
>
> This question also has been fully settled by our Supreme Court and is not now open to debate. The substance of all these decisions is to the effect that the Public Utilities Act conferred upon the Public Utilities Commission the power of changing the rates to be charged by public utilities corporations. [Citations.] *It is clear that the provisions of the State and federal constitutions forbidding the passage of laws by the State impairing the obligations of contracts do not apply* to the contract involved in the case at bar." (Emphasis added.) 222 Ill. App. 288, 293-94.

■ *Lust* clearly holds that a lawfully created agency of the State such as the RTA and CTA has the power to enact this type of fare hike. No pass holder was charged for rides taken before it became effective but rather for those trips subsequent to the fare increase. Applying the court's rationale in *Lust* to the case at bar, we find that the surcharge was prospective.

We therefore hold that: (1) plaintiffs had a contract with both defendants—the CTA and the RTA; (2) defendants properly exercised their statutorily granted authority to raise fares, which grant of authority became an implied term of the contract with plaintiffs; and (3) the contract was not breached.

For the foregoing reasons, the decision of the circuit court granting plaintiffs' motion for partial summary judgment on count I, the issue of liability, is reversed. Upon remand, the court is directed to enter judgment in favor of defendants on count I based upon our disposition of the question certified for review.

Reversed and remanded with directions.

SULLIVAN, P.J., and MEJDA, J., concur.