Zev KARKOMI, et al., etc., Plaintiffs,

v.

AMERICAN AIRLINES, INC., et al., Defendants.

No. 89 C 2960.

United States District Court, N.D. Illinois, E.D.

Aug. 3, 1989.

---

Harry A. Young, Jr., Alan Rosen, William R. Klein, Neistein, Richman, Hauslinger, Young & Rosen, Ltd., Chicago, Ill., for plaintiffs.

Robert E. Haley, Richard C. Palmer, Gregory S. Norrod, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for American Airlines, Inc.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Zev Karkomi ("Karkomi"), his wife Shifra Karkomi and their daughter Vickie Siegel ("Siegel"), individually and as next friend of her minor son Ari Siegel ("Ari"), originally sued American Airlines, Inc. ("American") and Myrna Shaw ("Shaw") in the Circuit Court of Cook County, claiming:

1. American's violation of 49 U.S.C. App. § 1374 (Count 1[1]);

2. American's several common-law infractions:

[1] Though the Complaint uses Roman numerals to designate the several counts, this opinion will employ the more universally used Arabic numbering.

[2] Familiar Rule 12(b)(6) principles require this Court to accept as true all of plaintiffs' well-pleaded factual allegations, drawing all reasonable inferences in their favor (*Marmon Group,*

(a) breach of fiduciary duty as a common carrier (Count 2);

(b) conversion (Count 3);

(c) negligence (Count 4);

(d) intentional infliction of emotional distress (Count 5); and

(e) breach of contract (Count 6); and

3. Shaw's intentional interference with contract (Count 7).

After the proper removal of the action to this District Court, American answered Counts 1, 3 and 6 and moved to dismiss Counts 2, 4 and 5 under Fed.R.Civ.P. ("Rule") 12(b)(6). For the reasons stated in this memorandum opinion and order, the motion is granted in its entirety.

### Facts [2]

Karkomi is a member of American's Gold Advantage Frequent Flyer Program. Under that program American permitted him to buy tickets at the regular coach fare and then call American's O'Hare Airport personnel, who would upgrade his tickets to first class at no additional charge.

In early 1988 Siegel made reservations for herself and Ari to fly to and from Acapulco, Mexico that December on American. She made arrangements to purchase the tickets through travel agent Shaw. When Karkomi later arranged for tickets for all four family members through another travel agent, Siegel cancelled her own ticket arrangements with Shaw (but not her reservations with American).[3]

On November 22, 1988 Karkomi bought four discounted round trip coach tickets to Acapulco from a travel agent and had all four upgraded for first-class travel. Accordingly he received in the mail four coach tickets and four first-class boarding passes.

Apparently angered by her lost revenue, Shaw tried to have the reservations cancelled and complained to American about

*Inc. v. Rexnord, Inc.,* 822 F.2d 31, 34 (7th Cir. 1987) (per curiam)).

[3] In this respect the Complaint's allegations are a bit nebulous, but their clarification (though that problem should be addressed in the future) is unnecessary for purposes of the current motion.

the situation. On December 21, 1988 the four plaintiffs presented their tickets and boarding passes to American at O'Hare. Initially American confiscated the tickets and passes and prevented all four from boarding, but its personnel ultimately returned the papers and permitted them to board and fly first class to Acapulco.

On December 29, 1988 Karkomi alone attempted to board the plane for his return to Chicago. American employees in Acapulco refused to honor—and confiscated—both his ticket and the boarding pass pursuant to orders from American in Chicago. This time they were not returned, Karkomi was not given any explanation for those actions, and he had to buy a new full-fare one-way ticket back to Chicago. That purchase, including a first-class upgrade, cost him an additional $350. On January 2, 1989 the rest of the Karkomi–Siegel group tried to return home, and the identical series of events befell them at an additional cost of $900.

### Fiduciary Duty

Count 2 ¶ 18 alleges that American:
owed plaintiffs fiduciary duties to protect plaintiffs from abuse and ill treatment by its employees and to provide plaintiffs with safe and comfortable passage for which plaintiffs already had paid.

American challenges the existence of any such fiduciary duties.

This Court has often quoted *Carey Electric Contracting, Inc. v. First National Bank of Elgin*, 74 Ill.App.3d 233, 237–38, 30 Ill.Dec. 104, 108, 392 N.E.2d 759, 763 (2d Dist.1979) (citation omitted) on the Illinois law of fiduciary relationships:[4]

A confidential or fiduciary relationship involves confidence and trust on one side and dominance and influence on the other.... Such a relationship exists as a matter of law between attorney and client; guardian and ward; and principal

and agent, and may exist in other cases where one party is heavily dependent upon the advice of another....

Normal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship.

As for the burden of proof in this area, *Carey Electric, id.* (citation omitted) says:

The existence of such a fiduciary relationship must be shown by proof so clear and convincing, so strong, unequivocal and unmistaken that it leads to only one conclusion.

■ Illinois treats the relationship between a passenger (such as Karkomi) and a common carrier (such as American) as contractual in nature (*Burns v. Regional Transportation Authority*, 112 Ill.App.3d 464, 468–69, 67 Ill.Dec. 868, 871, 445 N.E.2d 348, 351 (1st Dist.1982), *rev'd on other grounds sub nom. Stack v. Regional Transportation Authority*, 101 Ill.2d 284, 78 Ill.Dec. 135, 461 N.E.2d 969 (1984)). Nothing in that relationship implies the existence of fiduciary obligations. Though *United Airlines, Inc. v. Lerner*, 87 Ill. App.3d 801, 803–04, 43 Ill.Dec. 225, 228, 410 N.E.2d 225, 228 (1st Dist.1980) did impose fiduciary duties on an airline, that was only in the context of its acting as a travel agent in arranging a package tour. No such circumstance, or any other triggering the same kind of inference, obtains here.

P.Mem. 5 contends common carriers owe a duty to their passengers to protect them from abuse from the carriers' employees. But even were such a duty held to exist in Illinois (a matter as to which plaintiffs point to no Illinois authority), it would not rise to the level of fiduciary responsibility. Indeed, the court's discussion and analysis in *United Airlines* plainly indicate that the fiduciary relationship was found despite, not because of, the airline's status as a common carrier—it was entirely a function

---

**4.** All parties have assumed without discussion that Illinois law applies, though plausible arguments could certainly be made for applying either Mexican law or federal law (the Warsaw Convention). That joint assumption may be

treated as a stipulation invoking Illinois law (see *National Ass'n of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1284–85 (7th Cir.1985)).

of the wholly separate principal-agent relationship between the parties when the airline acted as a travel agent. Whatever else a common carrier may be, it does not exert domination or influence over its passengers such as to import fiduciary duties on its part.

Plaintiffs have not met the heavy burden of showing the existence of a fiduciary duty. Count 2 is dismissed.

### Negligence

Count 4 ¶ 18 alleges that American:

owed plaintiffs a duty of due care to adequately and properly train its employees and to implement appropriate procedures for processing and honoring valid tickets and boarding passes.

Count 4 ¶ 20 goes on to allege that as a consequence of American's breach of that duty, plaintiffs not only incurred the additional expense of the new tickets but also suffered "annoyance, vexation, humiliation and embarrassment."

Those allegations embrace two types of negligently-inflicted harm: economic loss and emotional distress. Both those kinds of claim face insurmountable obstacles under Illinois law.

■ *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 86–91, 61 Ill.Dec. 746, 753–56, 435 N.E.2d 443, 450–53 (1982) and its progeny bar plaintiffs' recovery for such economic loss in a negligence action. Although *Moorman* itself was a product liability action, later cases have much expanded the applicability of the identical principle. Thus *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill.2d 146, 153, 104 Ill.Dec. 689, 692, 503 N.E.2d 246, 249 (1986) painted with the broadest of brushes:

A plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's

inability to recover under an action in contract.

Only three exceptions to that all-encompassing rule have been identified most recently in *LaSalle National Bank v. Edward M. Cohon. & Associates, Ltd*, 177 Ill.App.3d 464, 475, 126 Ill.Dec. 629, 636, 532 N.E.2d 314, 321 (1st Dist.1988) (citations omitted):

Exceptions to this rule barring recovery for economic losses arise where: (1) professional negligence is alleged …;[5] (2) where [sic] one intentionally makes false representations …; or (3) where [sic] one who is involved in the dissemination of specialized knowledge or information for the guidance of others in their business transactions allegedly makes negligent representations….

And plainly none of those exceptions is present here.

■ As for plaintiffs' "negligent infliction of emotional distress" claim, that Illinois tort has been the subject of a recent review by our Court of Appeals in *Gillman v. Burlington Northern Railroad Co.*, 878 F.2d 1020, 1023 (7th Cir.1989). Only the third of the three *Gillman*-identified requirements (*id.*) need be mentioned here:

[T]he plaintiff must show some sign of physical injury or illness as a result of his emotional distress.

Plaintiffs allege no such injury or illness.

Absent any such allegations, the loss at issue is purely economic (see, e.g., *Anderson Electric*, 115 Ill.2d at 152, 104 Ill.Dec. at 691, 503 N.E.2d at 248). Nothing suggests that Illinois courts, rejecting as they do claims for economic loss and emotional distress separately, would sanction a claim for those factors if combined.

Plaintiffs urge that American owed them duties as a common carrier, taking them outside of the *Anderson Electric* rule. Their only claimed authority for such an independent duty is *Sherrod v. Piedmont*

---

**5.** [Footnote by this Court] Indeed, any continuing validity of this exception (resting as it does on the pre-*Anderson* decision in *Rosos Litho Supply Corp. v. Hansen*, 123 Ill.App.3d 290, 78 Ill.Dec. 447, 462 N.E.2d 566 (1st Dist.1984)) is doubtful, given the breadth of the *Anderson*

announcement and the rationale on which it is based. But this is not the occasion to consider whether that aspect of *LaSalle* would have to be followed by this Court, for the issue is wholly irrelevant here.

*Aviation, Inc.*, 516 F.Supp. 46 (E.D.Tenn. 1978). *Sherrod, id.* at 49 & n.* held a plaintiff wrongfully ejected from defendant's aircraft could sue under Illinois law for both the breach of the contract of carriage and the tort accompanying the breach. But the only cases cited in the authority on which *Sherrod* relied (7 I.L.P. *Carriers* § 598, at 97–99 (1954)) are those in which the plaintiff was actually ejected from a conveyance. That did not occur here, for plaintiffs paid the additional fare.

For example, *Pennsylvania Railroad Co. v. Connell*, 112 Ill. 295, 304–05 (1884) quotes this passage from *Chicago, Burlington & Quincy Railroad Co. v. Griffin*, 68 Ill. 499 (1873):

> If a passenger pays his fare to a certain station, and the ticket agent inadvertently gives him a ticket to an intermediate station, the demand of a fare a second time by the conductor will be a breach of the implied contract on the part of the company to carry him to the proper station. By paying on such demand, his action will be as complete as if he resists the demand and suffers himself to be ejected, and his ejection in such case will add nothing to his cause of action. It is his duty to pay the fare demanded, and if the company fails to make suitable reparation for the indignity, he can maintain his appropriate action.

But *Connell, id.* at 304 says just before that quotation:

> Had appellee paid the fare demanded, he might have sued the company and recovered for a breach of the contract. Had he left the train when the conductor refused to receive the ticket and ordered him to leave, he might have sued and recovered for all damages sustained in consequence of the act of the conductor expelling him from the train.

Even if we assume the continued validity of such century-old cases (which form *Sherrod*'s underpinning), their clear import is that consequential damages such as for "indignity" are available only where there has actually been a wrongful ejection. Their added teaching is that a plaintiff who pays the added fare is limited to a breach of contract claim.

Although the law of common carriers may impose a "higher duty" on them, it does not confer upon their passengers the right to create novel causes of action against them. Count 4 too is dismissed.

### Intentional Infliction of Emotional Distress

Count 5 ¶ 18 alleges that American:

> wrongfully, unlawfully and intentionally engaged in extreme and outrageous conduct in ordering plaintiffs' valid tickets and boarding passes confiscated, in refusing to allow plaintiffs onto flights for which plaintiffs had fully paid, and in threatening to strand plaintiffs in a foreign country.

As a result (¶ 19):

> plaintiffs suffered severe emotional distress at the prospect of being unable to return to their homes in Chicago, Illinois and from the public humiliation and embarrassment inflicted upon them by [American].

*McGrath v. Fahey*, 126 Ill.2d 78, 86, 127 Ill.Dec. 724, 727, 533 N.E.2d 806, 809 (1988) (citation omitted, emphasis in original) states Illinois' requirements for the tort of intentional infliction of emotional distress:

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause *severe* emotional distress.... The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining its severity.

American contends the Complaint meets neither the first nor the third of those requirements.

As for the first, American's conduct "must be more than 'mere insults, indignities, threats, annoyances, petty oppres-

sions, or other trivialities'" (*Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 623 (7th Cir.1989) (quoting *McGrath* )). Judged by an objective standard, "[i]t must be so extreme and outrageous that it goes beyond all possible bounds of decency" (*id.*) (citations omitted).

*Schroeder, id.* at 623–24 found that even crediting the conclusory allegations of the complaint in that case, defendants' actions were not extreme and outrageous and beyond all possible bounds of decency.[6] *Schroeder* involved detention and restraint of a passenger suspected (wrongly) of carrying a bomb on board an airplane. Yet the Court of Appeals did not find that conduct outrageous, noting that Illinois courts have rejected claims based on conduct *far* more egregious than that (*id.*).

In part *McGrath* speaks of the "intensity and duration of the distress [as] factors to be considered in determining its severity." Here plaintiffs were at most only temporarily inconvenienced—each of them immediately purchased new tickets and was on his or her way back to Chicago. Although American may have withheld entrance to the plane improperly (and temporarily), none of the allegations reflects harassment or outrageous treatment, let alone extended treatment of that nature.

P.Mem. 10 quotes *Public Finance Corp. v. Davis,* 66 Ill.2d 85, 90, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (1976) to the effect that "the extreme and outrageous character of the conduct may arise from an abuse of a position or relation with another which gives the actor actual or apparent authority over the other or power to affect his interests." But *Schroeder,* 875 F.2d at 624 says such a relationship does not by itself relieve plaintiffs of the obligation to allege specific outrageous conduct.

In sum, plaintiffs have not evaded the clear and direct impact of *McGrath* and *Schroeder.* As a matter of law (based of course on what plaintiffs have alleged), American did *not* exceed all possible bounds of decency.

That alone would suffice to defeat the claim under consideration. But plaintiffs also fail to satisfy the third prong of *McGrath*—severe emotional distress. As *Public Finance,* 66 Ill.2d at 90, 4 Ill.Dec. at 654, 360 N.E.2d at 767 (emphasis in original) put the matter:

> The emotional distress must be *severe.* Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term "emotional distress," these neutral conditions alone are not actionable.

Plaintiffs did not suffer distress "so severe that no reasonable man could be expected to endure it" (*id.*). At worst they sustained brief "public humiliation and embarrassment"—and perhaps the even more brief fear of being unable to return to Chicago.

*Public Finance,* 66 Ill.2d at 92, 4 Ill.Dec. at 655, 360 N.E.2d at 768 (citations omitted) said in the debtor-creditor context:

> A creditor must be given some latitude to pursue reasonable methods of collecting debts even though such methods may result in some inconvenience, embarrassment or annoyance to the debtor. The debtor is only protected from oppressive or outrageous conduct. . . .
>
> [L]iability usually has rested on a prolonged course of hounding by a variety of extreme methods.

That same type of conclusion is called for in a standard commercial transaction such as the one at issue here. Illinois cases recognize this extraordinary tort only in truly extraordinary circumstances. Noth-

---

**6.** Earlier cases in this Circuit properly suggest the viability of such a claim must be measured by the allegations of the complaint alone: *see Geist v. Martin,* 675 F.2d 859, 861–62 (7th Cir. 1982); *id.* at 865 (Swygert, J., concurring); *Gordon v. Matthew Bender & Co.,* 562 F.Supp. 1286, 1299 (N.D.Ill.1983) (citing Judge Swygert's concurrence in *Geist* ). But to the extent they could be read to suggest a different result here, those

cases have been overtaken by *McGrath* and by *Schroeder's* accurate reading of that case. Although *Schroeder* was decided in the summary judgment context, it credited the allegations of the plaintiff's complaint (just as this Court must do here) and found them wanting in terms of the extremely high standards Illinois has set for the tort (875 F.2d at 623–24).

**1346**

ing alleged in this case rises to such a level. Count 5 must also be dismissed.

### Conclusion

On the allegations this Court must credit at this stage of the proceeding, American's agents in Acapulco engaged in a bizarre refusal to permit plaintiffs to board. Some explanation may emerge when this action shifts gears from pleading to proof. But whether that takes place or not, plaintiffs have no warrant in law for the more extreme claims they have advanced. Counts 2, 4 and 5 of their Complaint are dismissed. This action is set for a status hearing at 9 a.m. August 24, 1989, when counsel for all the litigants should come prepared to discuss the scope of, and the anticipated time frame for, the remaining discovery required to have the case ready for trial.