JOSEPH SKELTON, Plaintiff-Appellee, v. CHICAGO TRANSIT AUTHOR-ITY, Defendant-Appellant.

First District (6th Division) Nos. 1—89—2258, 1—89—2359 cons.

Opinion filed May 17, 1991.—Rehearing denied June 27, 1991.

William H. Farley, Jr., and Flynn, Murphy & Ryan, both of Chicago, for appellant.

Martin J. Healy, Jr. & Associates, and William J. Harte, Ltd., both of Chicago (Martin J. Healy, Jr., William J. Harte, and Joan M. Mannix, of counsel), for appellee.

JUSTICE LaPORTA delivered the opinion of the court:

Plaintiff, Joseph Skelton, brought an action seeking recovery for personal injuries sustained when he fell from a station platform and was struck by an oncoming train owned and operated by defendant, Chicago Transit Authority (CTA). Following trial, the jury returned a verdict in favor of plaintiff for $7,824,655, but reduced the award of damages by 70% to $2,347,396 based upon plaintiff's contributory negligence. Defendant has appealed from the judgment entered on the jury's verdict, and plaintiff has filed a separate appeal on the jury's determination of plaintiff's comparative fault.

On appeal, defendant CTA contends that (1) the trial court erroneously instructed the jury that defendant owed plaintiff a duty of the highest degree of care; (2) the trial court abused its discretion in excluding evidence of plaintiff's consumption of alcohol prior to the incident; (3) the trial court erred in allowing evidence of willful and wanton entrustment of a CTA train based upon the prior work record of the motorman; (4) the trial court erred in excluding evidence that plaintiff had filed two prior complaints which made no claim that a previous train had failed to stop at the Oak Park Avenue station or that the train which struck plaintiff had failed to stop at the Harlem Avenue station; (5) the trial court improperly permitted testimony as to the extent of future medical costs to maintain plaintiff's artificial arm; (6) the trial court erred in permitting plaintiff to examine two CTA employees as adverse witnesses; and (7) the trial court improperly allowed the introduction of inflammatory and speculative testimony about plaintiff's intention to become an electrician in the future.

Plaintiff contends that (1) the jury's determination that plaintiff's comparative fault amounted to 70% was against the manifest weight of the evidence; (2) improper comments by defense counsel during closing argument denied plaintiff a fair trial; (3) the trial court erred in allowing defendant to present evidence of commendations previously received by the motorman of the train which struck plaintiff; (4) the court's order *in limine* excluding witnesses was violated by a conversation between two CTA employees during a recess in the trial; and (5) the trial court erred in refusing plaintiff's tender of Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971).

## STATEMENT OF FACTS

Plaintiff's complaint, as finally amended, alleged that he suffered personal injuries purportedly caused by the negligence and willful and wanton conduct of the defendant. Specifically, plaintiff claimed that he was injured when he was struck by an oncoming CTA train after falling from the station platform located at Oak Park Avenue on the Congress line of the CTA in the Village of Oak Park, Illinois. Plaintiff alleged that defendant owed him a duty of "the highest degree of care."

Count I of plaintiff's amended complaint asserted that defendant was negligent in failing to prevent its agents from passing through the Oak Park Avenue station without stopping; operating its trains on Runs 130 and 222 at an excessive rate of speed; failing to keep a proper lookout for persons waiting for trains; failing to give plaintiff proper warning that both trains were approaching the Oak Park Avenue station; failing to slow the trains as they approached the Oak Park Avenue station; failing to stop the train on Run 222 to avoid a collision with plaintiff; designing the passenger platform so that the waiting area was too narrow; and failing to provide plaintiff with a clear view of approaching trains.

Count II asserted that defendant was guilty of willful and wanton conduct by operating the trains on Runs 130 and 222 for a long distance at an excessive rate of speed when it knew or should have known of the dangers to passengers on CTA platforms; failing to prevent its agents from passing through the Oak Park Avenue station on Run 130 without stopping; failing to stop the train on Run 222 at the Harlem Avenue station despite the fact that it was a scheduled stop; approaching the Oak Park Avenue station with the trains on Runs 130 and 222 at an excessive rate of speed when they knew or should have known that to do so might or could cause injury to plaintiff; approached the Oak Park Avenue station with the train on Run 222 at an excessive rate of speed and without intent to make a scheduled stop; failing to reduce the speed of the trains on Runs 130 and 222 and failing to warn plaintiff of the approach of the trains through a horn signal when it knew or should have known that failure to do so might or could cause injury to the plaintiff; and failing to operate the train on Run 222 in such a manner as to avoid a collision with the plaintiff.

Count III asserted that defendant was guilty of willful and wanton conduct by entrusting its train to motorman Albert Kemnitz without adequately instructing him in the safe operation of the train; en-

trusting its train to Kemnitz when it knew or should have known, based upon Kemnitz' prior work record, that to do so might or could cause injury to members of the public; entrusting its train to Kemnitz without adequate supervision when it knew or should have known that to do so might or could cause injury to members of the public.

Defendant's answer to plaintiff's amended complaint denied that it owed plaintiff a duty of "the highest degree of care," denied the allegations of negligent and of willful and wanton conduct, and asserted as affirmative defenses that the negligence of the plaintiff in falling off the platform onto the tracks and into the path of the train was the proximate cause of his injuries, and that plaintiff's consumption of alcoholic beverages resulted in an impairment of his mental and physical faculties and was a contributing factor in the plaintiff's conduct which resulted in his injuries.

Prior to trial, the trial court entered certain orders disposing of various motions *in limine* brought by both parties. These orders included rulings which (1) excluded any evidence indicating that plaintiff had consumed alcoholic beverages prior to the accident; (2) excluded introduction of any documents which had not been produced to the other party during pretrial discovery; and (3) excluded from the proceedings witnesses who were to be called to testify.

The evidence adduced at trial established that the Congress line of the CTA runs from Des Plaines Avenue, through downtown Chicago, and on to Jefferson Park. From Des Plaines Avenue to downtown, the train tracks run adjacent to the Congress (Eisenhower) expressway. As the line proceeds east, the first stop after Des Plaines Avenue is Harlem Avenue, the second is Oak Park Avenue, the third is Austin Avenue, and the fourth is Cicero Avenue. There are a total of 29 stops on the Congress line, and every one is a designated stop. Each train is required to stop at each station unless given a direct order from the CTA control center. Each station is equipped with berthing marks which indicate the proper stopping place for the train, depending upon the number of cars in the train. The CTA rules require that a motorman stop at all designated stops unless otherwise ordered. The rules also require that motormen look ahead, be constantly alert for any condition which may cause injury or damage, and be ready to bring their trains to an immediate stop.

Train crews are assigned to runs, and a run assignment indicates the schedule the train must maintain. Run 130 on the Congress line is scheduled to leave Des Plaines Avenue at 1:12 a.m. and to arrive at Jefferson Park at 1:51 a.m. Run 222 is scheduled to depart Des Plaines Avenue at 1:41 a.m. and is scheduled to arrive at Jefferson

Park at 2:20½ a.m. Run 222 is always a two-car train, and the approximate time difference between Run 130 and Run 222 is 29 minutes.

Each train runs through time check points, by which the control center can monitor the operation of each train. The CTA keeps a record of each train's progress through these time check points. These records, called Esterline charts, are retained by the CTA for 1½ to 2 years.

Plaintiff testified that on June 16, 1981, he and Jacqueline Gullo, now his wife, went to a tavern and blues club to listen to music with some friends. Plaintiff and Gullo rode a westbound train on the CTA's Congress line to the Oak Park Avenue station, walked approximately eight blocks, and met their friends at the blues club at about 10 p.m.

The two remained at the blues club listening to music for approximately 2½ hours. Prior to trial, plaintiff admitted that he had consumed three beers while at the club, but the trial court's order *in limine* precluded introduction of this evidence at trial.

Plaintiff and Gullo walked back to the Oak Park Avenue CTA station and arrived at about 1 a.m. on June 17, 1981. The two walked onto the train platform and sat down on the bench situated within the windbreak. There was no ticket agent on duty, but an illuminated sign read "Board Here, Please Pay on Train." Plaintiff and Gullo were the only people on the train platform, and the platform was clean and dry.

Plaintiff testified further that after he and Gullo had been waiting for about 25 minutes, an eastbound train passed through the station without slowing down or stopping. After this train went through the station, plaintiff occasionally got up and walked to the edge of the platform to see if the next train was coming so that he could ensure it would stop. Plaintiff testified that it was dark out, and he did not have a clear view of the tracks. He could only see a short distance down the eastbound tracks because they were not straight but, by leaning a little, he could see farther down the tracks.

Plaintiff testified that when he heard a second train coming, he got up from the bench so he could flag the train down to make sure it stopped. Standing at the edge of the platform, plaintiff could see the train which appeared to him to be "going as fast as they go." He started waving to get the attention of the driver of the train to make sure the train would stop. Plaintiff was standing in the middle of the windbreak, about one foot from the edge of the platform, facing west and using his left arm to signal the driver of the train. While waving, plaintiff leaned so that his body was less than one foot away from the edge of the platform and his arm was over the edge of the platform.

As the train came towards him, plaintiff lost his balance and fell onto the tracks. Plaintiff testified that he did not know why he lost his balance and fell from the platform.

According to plaintiff, the train was still proceeding at the same speed and was not braking. After he fell, plaintiff tried to roll or crawl off the tracks and wound up underneath the platform somewhere between the two ends of the windbreak. Upon moving away from the tracks, the first thing plaintiff remembered was a feeling of intense pain in his right arm.

Gullo's testimony substantially corroborated plaintiff's account of the accident and of the events of the evening prior to the accident. Gullo testified, as did plaintiff, that the train which was approaching while plaintiff was waving his arm was travelling fast and did not appear to be braking when he fell. Both plaintiff and Gullo denied that they fell asleep while sitting on the bench and waiting for the train. Gullo testified that as they sat on the bench, she had her head on plaintiff's shoulder and her eyes closed, but that neither one of them was asleep. Gullo testified that plaintiff's fall was totally unexpected and that she had no idea why he fell.

Emmanuel Wade, a passenger on the train which struck plaintiff, testified that he and his girlfriend, Joyce Burton, boarded the train at Des Plaines Avenue, two stations before Oak Park Avenue. Wade and Burton were seated in the second row of seats in the front car, and from this position, Wade was able to see what was in front of the train. Wade testified on direct examination that there were no other passengers on the train when he and Burton boarded. Subsequently, about five passengers entered the first car of the train, and about five passengers entered the second car. Wade acknowledged that after the accident, he, Burton, and all of the other individuals on the train gave their names and addresses to one of the CTA employees. Wade admitted on cross-examination that he testified at his pretrial deposition that when he and Burton entered the train there were several people, including some Mexicans, already on the train sitting near the rear of the car.

Wade testified further that the train passed through the Harlem Avenue station at approximately 50 to 55 miles per hour, without stopping. As it left the Harlem Avenue station, the train was moving fast, and Wade could see that it was passing some of the cars on the adjacent expressway. As the train approached the Oak Park Avenue station, Wade saw plaintiff waving his arm. Plaintiff was standing between the two ends of the windbreak. Wade also saw a woman sitting on the bench in the middle of the windbreak. According to Wade, the

train was not braking at that time. Wade then saw plaintiff fall. As plaintiff started to fall, the train started braking, then slowed down, slid, and stopped. Wade stated that the train made an unusual stop and that he and Burton fell forward in their seats. Wade testified that he did not know why plaintiff fell.

Albert Kemnitz, an employee of the CTA for 26 years before his retirement and the motorman of the train that struck plaintiff, testified that there were three passengers on the train when it started, a man and woman in the rear of the first car near the conductor, and a man across from the motorman's cab in the front of the car. Kemnitz admitted on cross-examination, however, that the motorman cannot see to the rear of the train from the cab, but can only see to the side through a window in the cab door.

Kemnitz testified that the train made its normal stop at Harlem Avenue, but no one got on or off the train. As the train approached the Oak Park Avenue station and was about 250 feet west of the edge of the platform, Kemnitz saw plaintiff and Gullo at the station. Gullo was seated on the bench in the first windbreak, and plaintiff was standing over her. Kemnitz slowed the train down in order to bring the train up to the two-car berthing mark. At that time, Kemnitz was applying the strongest braking level he could, and the train was travelling at 10 to 15 miles per hour.

Kemnitz testified further that when the train was about five feet west of the west end of the windbreak, plaintiff turned and, as he was looking at the train, walked off the edge of the platform, five feet in front of the oncoming train. According to Kemnitz, plaintiff walked off the platform deliberately, without hesitating. Kemnitz immediately applied the emergency brake and stopped the train. He then called the CTA control center and told them to shut the power off on the third rail and to call for emergency assistance from the police and fire departments. According to Kemnitz, the train stopped approximately 15 to 20 feet east of the point where plaintiff stepped off the platform, 20 to 30 feet beyond the point where it struck plaintiff, and 100 feet before the two-car berthing mark.

Over defense counsel's objections, plaintiff was permitted to question Kemnitz and to present written documents of his work record for the years 1973, 1975, and 1976. During the course of this line of questioning, Kemnitz initially denied that he had ever failed to make a scheduled stop on the Congress line, but subsequently admitted that there were some occasions in the past on which he did not make a full stop.

The written documents of Kemnitz' work record reflected that on August 2, 1973, Kemnitz failed to make a scheduled stop at the Austin Avenue station. On February 4, 1975, Kemnitz failed to make a scheduled stop at the Cicero Avenue station, and on December 20, 1976, he failed to make a scheduled stop at the Harlem Avenue station. These records also indicated that Kemnitz was cautioned by superiors after each of these incidents.

Another CTA document indicated that on January 21, 1981, Kemnitz ran a flagman's trip, a device which is designed to stop a train where there are workers on the track. As a result of this violation, Kemnitz was suspended for five days and was required to attend a retraining program. The CTA document reflected that after the retraining program, Kemnitz failed the signal test and was required to take it again.

Kemnitz also testified that during his 26-year service with the CTA, he had three times received the employee-of-the-year award and received special recognition awards in the years 1977, 1979, 1984. Kemnitz also received a special commendation in 1981 for his emergency handling of a train to avoid a collision when an intoxicated man was on the tracks.

The testimony of Jesse McAdory, the conductor of the train that struck plaintiff, substantially corroborated that of Kemnitz. McAdory stated that when Run 222 left the Des Plaines Avenue station, he was positioned in the rear of the first car. After leaving the Des Plaines Avenue station, the train made its normal stop at the Harlem Avenue station. Because no one was getting on or off, McAdory did not open the doors, but instead signalled to Kemnitz, and the train proceeded.

About two seconds before the accident, McAdory saw plaintiff walk from the bench area of the platform toward the train and step off the platform about five feet in front of the train. At that point, the train was travelling at about 10 miles per hour. As soon as plaintiff stepped off the platform, Kemnitz applied the emergency brake, and the train stopped.

James Green, the conductor on Run 130, the eastbound train immediately preceding the train operated by Kemnitz, testified that on its last trip on June 17, 1981, Run 130 left the Des Plaines Avenue station at 1:12 a.m. and arrived at the Jefferson Park station at 1:51 a.m. When the train pulled into the Harlem Avenue station, Green looked both ways to see if anyone was coming to catch the train. Because no one was getting on or off, Green signalled the motorman, and the train proceeded.

Green testified further that the train stopped at the Oak Park Avenue station where Green observed plaintiff and Gullo sitting on a bench on the platform. Plaintiff and Gullo were leaning together as if they were asleep, and they did not move when Run 130 pulled into the station. Green admitted that he did not attempt to wake them, although one of the CTA rules requires that employees observing passengers sleeping on station platforms should attempt to wake them.

Frederick Smith, the motorman on Run 130, also testified that the train made its scheduled stop at Harlem Avenue and then went on to stop at Oak Park Avenue.

Alan Moyzis, a member of the CTA police, testified that on June 17, 1981, he received a call indicating that a person had been hit by a train at the Oak Park Avenue station. When he arrived, members of the Oak Park police and fire departments were already present. His purpose in going to the scene was to do an investigation, to ensure that everyone was treated fairly, and to protect the CTA from any harm.

Moyzis prepared a report which indicated that the plaintiff had been run over by the Run 222 train as the motorman was pulling the train into the station. The report indicated further that the plaintiff and a female companion suddenly appeared from the waiting area on the platform approximately 100 feet from the two-car berthing mark. Moyzis' report did not reflect that Kemnitz stated he saw plaintiff 200 to 250 feet before the train hit him or that plaintiff deliberately walked off the platform.

Moyzis stated that when he arrived on the scene, the plaintiff was underneath the middle of the platform. Although other people from the Oak Park police and fire departments were present, only two paramedics were underneath the platform trying to get plaintiff on a gurney. Moyzis stated that he went down on the north side of the platform and held the gurney while the two paramedics lifted plaintiff.

Moyzis testified that he spoke with Gullo at the scene and again at the hospital. When he interviewed Gullo at the scene, she was crying and hysterical but demonstrated for him what had happened. Gullo told Moyzis that she and plaintiff had been sitting on the bench, and she fell asleep. When the train came into the station, both she and plaintiff got up and walked to the edge of the platform to board the train. When she got to the edge, she stopped, but plaintiff was half asleep and walked over the edge and fell in front of the train. Moyzis concluded from his investigation that the train stopped 20 to 30 feet beyond the point where it struck plaintiff and 100 feet before

the two-car berthing mark. He acknowledged, however, that the numbers "20," "30," and "100" in his report appear to have been darkened or somehow altered.

Russell Zdeb, a rail supervisor for the CTA, testified that he arrived at the scene of the accident after plaintiff had been removed. Zdeb's purpose in going to the scene was to ensure restoration of service. He did not recall to whom he spoke, but he would normally ask the motorman to tell him what happened. According to Zdeb's report, the accident occurred when the plaintiff heard the train coming, awoke from sleep, and accidentally stepped off the platform in front of the train.

John Blum, an employee of the CTA for over 16½ years, was a rail service superintendent at the time of the accident. When he arrived at the scene, other CTA employees were already there, including the motorman and conductor of the train, and a CTA security person.

Anthony Kral, a fire fighter and emergency medical technician with the Oak Park fire department for 23 years, testified that he was called to respond to the accident. When he arrived, he was advised by the conductor that the power was off. Kral was the first person to go down under the platform to try to help plaintiff. When Kral jumped down on the south side of the platform and looked underneath, he observed plaintiff crouched down under the north side of the platform. He yelled up to the others on the scene and told them that plaintiff was under the north side of the platform. Then Kral and another member of the fire department crawled under the platform to plaintiff, who was squatting down and holding his injured arm. Kral saw that plaintiff's right arm was damaged and that his jacket was saturated with blood. Plaintiff was conscious but in shock and did not respond when Kral tried to talk to him. When Kral applied a tourniquet to plaintiff's arm, plaintiff cried out in pain. Plaintiff was removed from underneath the north side of the platform and transported to West Suburban Hospital.

Kral testified that he only remembered three other people underneath the platform trying to help plaintiff, two other fire fighters and an Oak Park police officer. He could not recall if another person in a police uniform was also there or whether any of the people who helped plaintiff underneath the platform were from the CTA.

Oak Park police officer James Leahy testified that when he and his partner, Ron Wozniak, arrived at the scene, members of the fire and police departments and some CTA employees were already present. When Leahy arrived, the paramedics were in the process of

removing plaintiff from the scene. Leahy did not recall seeing Gullo on the platform, but saw her at the hospital, where she was hysterical and had been placed in a wheelchair. Leahy stated further that he learned at the scene that there were three passengers on the train and that their names were Wade, Burton, and Castro.

Officer Wozniak testified to substantially the same facts as did Leahy. When they arrived, plaintiff was in the process of being wheeled up the ramp at the Oak Park Avenue station. Wozniak testified that he could not remember seeing any CTA personnel other than the motorman and conductor at the scene.

William Richmond, plaintiff's expert, made various calculations of the speed of the train at the point of impact, assuming that the point of impact was the midpoint of the windbreak, and assuming that the train stopped 20 to 30 feet beyond the point of impact. Richmond calculated that if the train stopped 30 feet beyond the point of impact, it was travelling at 17 miles per hour when it hit plaintiff. If the train stopped 25 feet beyond the point of impact, the train was travelling at 15½ miles per hour. If the train stopped 20 feet beyond the point of impact, the train was travelling at 14 miles per hour when it struck plaintiff.

Richmond also calculated that if the emergency brake was applied five feet west of the windbreak and the train stopped 30 feet beyond the midpoint of the windbreak, the train was travelling at 20 miles per hour. If the emergency brake was applied five feet west of the windbreak and the train stopped 25 feet beyond the midpoint of the windbreak, the train was travelling at just under 19 miles per hour. If the emergency brake was applied five feet west of the windbreak and the train stopped 20 feet beyond the midpoint of the windbreak, the train was travelling at 17½ miles per hour.

Plaintiff testified that he was taken from the Oak Park Avenue station to West Suburban Hospital, where he was told that his right arm would have to be amputated. An amputation was not performed at that time, however, and plaintiff was later taken by ambulance to Northwestern Memorial Hospital, where surgery was performed to save plaintiff's arm. Although he was put on an exercise program to try to get his fingers moving and to circulate the blood, plaintiff's arm became progressively worse. Gangrene set in, and approximately two weeks after he had been in the hospital, plaintiff was advised that his right arm had to be amputated between the shoulder and the elbow. Plaintiff stated that he experienced great pain as a result of the amputation and continues to experience "phantom pain" in his amputated limb.

Upon being discharged from the hospital, plaintiff started going to the Rehabilitation Institute, where physical therapists helped him with his stump. In September 1981, a conventional prosthesis was prescribed for plaintiff. Although he received the prosthesis about nine months after the accident, plaintiff did not wear it for about 1½ years because he did not like it and because he had become accustomed to having his stump unencumbered.

Dr. Robert Thompson testified that plaintiff suffered severe tissue, nerve, and bone damage at the elbow and above in his right arm. Pins were inserted to anchor the bone in place and to minimize any movement to assist healing. Plaintiff experienced pain caused by the amputation procedure and as a result of the subsequent neuromas which occur whenever a nerve is cut in an amputation. Thompson testified further that the sensitivity of plaintiff's stump and his "phantom pain" are permanent conditions.

Millet Kedys, a certified prosthesist, testified that he first saw plaintiff on October 6, 1981. Plaintiff had a prescription for a conventional prosthesis which Kedys made for him. Plaintiff also expressed interest in a myoelectric prosthesis, which is battery operated. Plaintiff and Kedys subsequently flew to Utah so plaintiff could be fitted for a myoelectric prosthesis. Plaintiff has had ongoing problems with this artificial limb, and at the time of trial, it was being repaired by the manufacturer in Utah.

Over defendant's objection, the trial court permitted the testimony of plaintiff and his mother that before his arm was amputated, plaintiff had planned to become an electrician. Several months before the accident, plaintiff had applied for membership in Local 134, the electricians' union to which his father, grandfather and uncle belong and which his grandfather had helped found. The trial court ultimately concluded that this evidence of lost future earnings was speculative, instructed the jury to disregard this testimony, and refused plaintiff's tendered instruction on the issue of his loss of future earnings.

After all of the witnesses had been heard, defendant sought reversal of the court's order *in limine* excluding evidence that plaintiff had consumed alcoholic beverages prior to the accident. During a *voir dire* offer of proof, conducted outside the presence of the jury, Gullo acknowledged that she had told Oak Park police and fire officials what had transpired that evening, but denied that plaintiff was intoxicated at the time he left the tavern, denied that they had argued while at the bar and that plaintiff left the blues club alone, and denied

that she followed him out of the club because she was concerned about his ability to walk.

During the same offer of proof, Robert R. Rentner testified that on June 17, 1981, he was a fire department official and was at the Oak Park Avenue station after the accident. Rentner spoke with Gullo and saw to it that she was taken to the hospital. Rentner testified that when he asked Gullo what had happened, she told him that she and plaintiff had been drinking in a tavern on Roosevelt Road; that plaintiff was drunk; that they had an argument. Plaintiff left and was staggering down the street. Gullo followed him because she did not want him to get in trouble or get hurt. Rentner stated that he had commiserated with Gullo. Rentner also acknowledged that he had no personal knowledge of the plaintiff's intoxication.

The trial court denied defendant's request for reversal of the order *in limine* excluding evidence of plaintiff's consumption of alcoholic beverages prior to the accident, and the case was submitted to the jury.

The court's instructions to the jury included a statement that defendant owed plaintiff a duty of "the highest degree of care." The trial judge based his decision to issue this instruction upon the "judicial admission" made by defendant in an answer to the complaint wherein defendant allegedly admitted plaintiff's assertion of this duty. The court declined to issue Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971), tendered by plaintiff, which would have permitted the jury to draw an adverse inference from the CTA's failure to produce the Esterline charts for the train runs at issue.

Upon considering all the evidence admitted by the trial judge, the arguments of counsel, and the court's instructions, the jury returned a verdict for plaintiff in the amount of $7,824,655, but reduced that verdict by 70%, the percentage of negligence attributable solely to the plaintiff, for a total award of $2,347,396. The court entered judgment for the plaintiff on that verdict, and the CTA brought a post-trial motion seeking relief from that judgment. The court denied the CTA's post-trial motion, and the CTA has appealed. Plaintiff has filed a separate appeal.

ANALYSIS

DUTY OF CARE

We initially consider defendant's contention that the trial court erroneously instructed the jury that defendant owed plaintiff a duty of the highest degree of care.

■■ ■ To state a cause of action for negligence, a plaintiff must allege the existence of a duty of care owed by defendant to plaintiff, a breach of that duty, and damages proximately resulting from the breach. (*Rowe v. State Bank* (1988), 125 Ill. 2d 203, 215, 531 N.E.2d 1358, 1364; *Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 162, 456 N.E.2d 116, 118.) Although the issues of whether a duty has been breached and whether the breach proximately caused the injury are factual matters, the question of the existence of a duty is one of law for the court. *Rowe*, 125 Ill. 2d at 215, 531 N.E.2d at 1364; *Curtis*, 98 Ill. 2d at 163, 456 N.E.2d at 119.

■■ A common carrier must exercise the highest degree of care to its passengers, and the passenger-carrier relationship does not terminate until the passenger has had a reasonable opportunity to reach a place of safety. *Katamay v. Chicago Transit Authority* (1972), 53 Ill. 2d 27, 29-30, 289 N.E.2d 623, 625; *Pharr v. Chicago Transit Authority* (1984), 123 Ill. App. 3d 205, 208, 462 N.E.2d 753, 755.

■■ ■ Defendant argues, however, that because plaintiff was not riding on, boarding, or alighting from a CTA train, he could not be considered to be a passenger, and consequently, the trial court erred by instructing the jury that the CTA owed plaintiff a duty of "the highest degree of care."

Illinois courts have long held that a contractual relationship between passenger and carrier begins when the passenger has presented himself at the proper place to be transported with the intention of becoming a passenger and is then either expressly or impliedly accepted by the carrier for transportation. (*Chicago & Eastern Illinois R.R. Co. v. Jennings* (1901), 190 Ill. 478, 60 N.E. 818; *Burns v. Regional Transportation Authority* (1982), 112 Ill. App. 3d 464, 468, 445 N.E.2d 348, 351, *rev'd on other grounds, Stack v. Regional Transportation Authority* (1984), 101 Ill. 2d 284, 461 N.E.2d 969; *O'Donnell v. Chicago & Northwestern Ry. Co.* (1903), 106 Ill. App. 287, 291.) Although it is not necessary that a fare has been paid or that the person have a ticket (*Illinois Central R.R. Co. v. O'Keefe* (1897), 168 Ill. 115, 48 N.E. 294; *Burns*, 112 Ill. App. 3d at 468, 445 N.E.2d at 351), the person must have placed himself under the care of the carrier, so that the circumstances will warrant an understanding on the part of the company that he is a passenger and under its care. (*Burns*, 112 Ill. App. 3d at 469, 445 N.E.2d at 351; *O'Donnell*, 106 Ill. App. at 291.) The person must be at some place which is under the control of the carrier and provided for passengers, such as the waiting room or platform at the station, so that the carrier may exercise the high degree of care imposed upon it. (*Burns*, 112 Ill. App. 3d at

468, 445 N.E.2d at 351; *O'Donnell,* 106 Ill. App. at 292.) Whether the uncontroverted facts establish the relationship of carrier and passenger is a question of law for the court to determine. *Burns,* 112 Ill. App. 3d at 469, 445 N.E.2d at 352; *O'Donnell,* 106 Ill. App. at 292.

In the instant case, the uncontroverted facts indicate that plaintiff and Gullo had entered the Oak Park Avenue station intending to catch the next train east to the city. There was no ticket agent on duty at that early hour of the morning, and an illuminated sign instructed passengers to pay their fares after boarding the train. Plaintiff and Gullo waited for the train on a bench on the platform near the windbreak. The motormen and conductors on both Run 130 and Run 222 saw plaintiff and Gullo on the train platform. There is no dispute that plaintiff was at the place provided by the CTA for waiting passengers and had placed himself under the care of the CTA while he and Gullo awaited an eastbound train.

■■ ■ We hold that the evidence presented at trial established that plaintiff was a passenger when he was struck by the defendant's train. Thus, the trial court properly determined, as a matter of law, that defendant owed plaintiff a duty of "the highest degree of care" and instructed the jury accordingly. Under these facts, it cannot be said that the court erred by instructing the jury that defendant was obligated to exercise "the highest degree of care" in its relationship with plaintiff.

Defendant also asserts that it was not obligated to exercise "the highest degree of care" with respect to its stations and platforms. It has consistently been held that the duty of a carrier to provide reasonably safe depots, platforms, and approaches for the use of passengers requires the exercise of only ordinary care. *Rotheli v. Chicago Transit Authority* (1955), 7 Ill. 2d 172, 176, 130 N.E.2d 172, 175; *Davis v. South Side Elevated R.R. Co.* (1920), 292 Ill. 378, 127 N.E. 66; *Darda v. Chicago Transit Authority* (1968), 100 Ill. App. 2d 94, 241 N.E.2d 478; *Sims v. Chicago Transit Authority* (1955), 7 Ill. App. 2d 21, 129 N.E.2d 23.

These cases are, however, distinguishable from the case at bar. The cases relied upon by defendant contemplate situations where the plaintiff sustained injuries as a result of defects or other unsafe conditions in the station or platform. This rule applies where the issue is the safety of the premises themselves and controls where the plaintiff seeks recovery under a theory of premises liability. This rule is not applicable where, as here, a passenger on a platform is injured by the carrier's train and seeks recovery based upon allegations of negligence in the operation of the train. In this situation, it is proper for

the jury to be instructed as to the duty owed by a common carrier to its passengers.

■■■ Defendant correctly contends that the trial court's instruction as to the duty owed to plaintiff could not be justified on the basis of an "admission" contained in the CTA's first answer to plaintiff's complaint. Any allegation of the duty owed to plaintiff can only be considered an allegation of a conclusion of law not based upon facts. (*Rowe*, 125 Ill. 2d at 215, 531 N.E.2d at 1364; *Curtis*, 98 Ill. 2d at 163, 456 N.E.2d at 119; *Burns*, 112 Ill. App. 3d at 469, 445 N.E.2d at 352; *O'Donnell*, 106 Ill. App. at 292.) Thus, an "admission" of that duty would constitute a conclusion of law and would be mere surplusage. (*Phillips v. Gannon* (1910), 246 Ill. 98, 108, 92 N.E. 616; *Darling v. Charleston Community Memorial Hospital* (1964), 50 Ill. App. 2d 253, 310, 200 N.E.2d 149, 178.) Consequently, the trial court should not have predicated its decision to issue the jury instruction of defendant's duty to plaintiff on the basis of an "admission" contained in defendant's initial answer to the complaint.

We have already held, however, the trial court's instruction was proper based upon the facts of the case. Therefore, although the court's stated justification for the instruction was incorrect, we hold that no error occurred where the instruction was appropriate based upon the facts of the case.

### EVIDENCE OF ALCOHOL CONSUMPTION

Defendant next contends that the trial court abused its discretion in excluding evidence of plaintiff's consumption of alcohol prior to the incident.

The record indicates that plaintiff consumed three beers during the 2½ hours he spent at the blues club prior to his entry onto the station platform.

■■ The issue of drinking cannot be raised or examined by a party unless that party can prove actual intoxication. (*Benuska v. Dahl* (1980), 87 Ill. App. 3d 911, 914, 410 N.E.2d 249, 252; *Gilberto v. Nordtvedt* (1971), 1 Ill. App. 3d 677, 679, 274 N.E.2d 139, 140.) Insinuations or innuendos of intoxication based upon evidence of drinking are impermissible where there is no evidence of intoxication. *Benuska*, 87 Ill. App. 3d at 914, 410 N.E.2d at 252; *Coleman v. Williams* (1976), 42 Ill. App. 3d 612, 616-17, 356 N.E.2d 394, 397-98; *McWethy v. Lee* (1971), 1 Ill. App. 3d 80, 85, 272 N.E.2d 663, 666.

■■ The evidence of intoxication must reveal actions or conduct which either directly or by reasonable inference establish that the individual's conduct at and before the accident was or may have been

affected by the use of alcoholic beverages. (*Clay v. McCarthy* (1979), 73 Ill. App. 3d 462, 466, 392 N.E.2d 693, 696; *Shore v. Turman* (1965), 63 Ill. App. 2d 315, 323, 210 N.E.2d 232, 236.) The supporting evidence necessary to prove intoxication must show an impairment of mental and physical faculties with the resultant diminution in the ability to think and act with ordinary care. *Clay*, 73 Ill. App. 3d at 466, 392 N.E.2d at 696; *Shore*, 63 Ill. App. 2d at 323, 210 N.E.2d at 236.

Intoxicating beverages affect different persons in different ways, and some persons would be intoxicated by the consumption of the same quantity of intoxicating beverages that the plaintiff consumed, but the consumption of a similar amount by other persons would have no effect on them or their demeanor. (*Osborn v. Leuffgen* (1942), 381 Ill. 295, 298-99, 45 N.E.2d 622, 624; *Hagopian v. First Venture, Ltd.* (1980), 90 Ill. App. 3d 951, 954, 414 N.E.2d 85, 87; *Kitten v. Stodden* (1966), 76 Ill. App. 2d 177, 181, 221 N.E.2d 511, 514.) The impairment can be shown directly, through the testimony of the person who was drinking, or circumstantially, either through the opinion testimony of one who observed the person who was drinking to the effect that he was intoxicated (*Bohnen v. Wingereid* (1979), 80 Ill. App. 3d 232, 237, 398 N.E.2d 1204, 1208; *Allison v. Davies* (1978), 64 Ill. App. 3d 900, 903-04, 381 N.E.2d 1034, 1037-38), or by presentation of evidence of unusual or erratic behavior on the part of the drinker (*Bohnen*, 80 Ill. App. 3d at 237, 398 N.E.2d at 1208; *McCullough v. McTavish* (1978), 62 Ill. App. 3d 1041, 1044, 379 N.E.2d 890, 893).

Defendant argues that there was a sufficient showing of intoxication to allow the evidence of plaintiff's consumption of alcohol to be considered by the jury. We find this argument is unpersuasive. The only evidence of intoxication proffered by defendant was the fact that plaintiff fell from the platform and that Gullo had allegedly told Rentner that plaintiff was drunk when they left the blues club. The comment allegedly made to Rentner by Gullo was clearly hearsay and inadmissible to establish intoxication of the plaintiff. *Hansel v. Chicago Transit Authority* (1971), 132 Ill. App. 2d 402, 408, 270 N.E.2d 553, 557; *Cole v. Cole* (1969), 116 Ill. App. 2d 344, 349, 253 N.E.2d 585, 587.

Thus, the only evidence tending to show that plaintiff was intoxicated was his fall from the platform. None of the witnesses to the accident were able to testify as to the reason for plaintiff's fall, and plaintiff himself testified that he merely lost his balance while he was flagging down the train. The evidence indicated that plaintiff fell from the platform at approximately 1:45 a.m. on June 17, 1981, and that he had been awake since 5 a.m. the previous day. Contrary to

defendant's argument, we do not find plaintiff's behavior was so unusual or erratic as to warrant the admission of evidence that he had consumed three beers sometime between 10 p.m. to 12:30 a.m., 1¼ to 3¾ hours prior to the accident. Consequently, the trial court did not abuse its discretion by excluding the evidence of plaintiff's consumption of alcoholic beverages before the accident occurred.

WILLFUL AND WANTON ENTRUSTMENT CLAIM

Defendant also contends that the trial court erred in allowing evidence of willful and wanton entrustment of a CTA train based upon the prior work record of the motorman.

 ██ Illinois courts have long held that liability may arise from the act of entrustment of a vehicle to one whose incompetency, inexperience or recklessness is known or should have been known by the owner or entrustor of the vehicle. (*Lockett v. Bi-State Transit Authority* (1983), 94 Ill. 2d 66, 445 N.E.2d 310; *Giers v. Anten* (1978), 68 Ill. App. 3d 535, 386 N.E.2d 82.) Willful and wanton misconduct is that which is committed with an intentional or reckless disregard for the safety of others. (*Klatt v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 481, 211 N.E.2d 720; *Giers*, 68 Ill. App. 3d at 539, 386 N.E.2d at 85.) Whether particular conduct can be characterized as willful and wanton depends upon the facts of each case and is a question of fact for the jury to determine. *Giers*, 68 Ill. App. 3d at 539, 386 N.E.2d at 85.

 In the instant case, plaintiff presented the evidence of Kemnitz' previous work record in order to establish his case against defendant for willful and wanton entrustment. Proof of Kemnitz' prior record was highly relevant and possibly essential to plaintiff's case on that issue. (*Lockett*, 94 Ill. 2d at 74, 445 N.E.2d at 314.) The trial judge issued limiting instructions to the jury which explained that this evidence was to be considered only in deciding the claim of willful and wanton entrustment. Had the court ruled that this evidence was inadmissible, plaintiff effectively would have been precluded from pursuing this cause of action. *Lockett*, 94 Ill. 2d at 74, 445 N.E.2d at 314.

Whether the defendant was guilty of willful and wanton misconduct by entrusting its train to Kemnitz was a question of fact. Plaintiff has alleged that defendant was aware that Kemnitz had failed to make scheduled stops in the past, and that the instant accident was proximately caused by his failure to prepare for or make a scheduled stop. Thus, plaintiff adequately stated a cause of action for willful and wanton entrustment, and he was entitled to have the

issue and the evidence go to the jury. *Giers*, 68 Ill. App. 3d at 541, 386 N.E.2d at 86.

PRIOR COMPLAINTS FILED BY PLAINTIFF

Defendant next asserts that it is entitled to a new trial because it was not allowed to present evidence of the two prior complaints which made no claim that a previous train had failed to stop at the Oak Park Avenue station or that the train which struck plaintiff had failed to stop at the Harlem Avenue station. Defendant has consistently and vigorously argued that the Esterline charts were not specifically requested by plaintiff until 1985, well after they had already been destroyed. Defendant claims that presentation of the two prior complaints filed by plaintiff would have explained the absence of the Esterline charts and the reason why they had not been preserved and introduced. We find this argument unpersuasive.

Defendant knew when the suit was originally filed that all records of train operations on the Congress line on June 17, 1981, the date of the accident, might be relevant. On August 2, 1982, less than 14 months after the accident, plaintiff filed a request for production of documents which sought the schedules of the trains departing the Des Plaines Avenue station on June 17, 1981, and all reports, memoranda, logs, notes or other written or printed matter relating to the operation of the trains and cars involved in the accident. Defendant knew or should have known that the Esterline charts would have provided evidence relevant to the determination of liability. Yet, these records were destroyed after a period of 1½ to 2 years as was the defendant's usual practice. We can only conclude that at the time the production request was filed, these Esterline charts had not yet been destroyed and should have been preserved.

The determination of admissibility of evidence is a matter of the trial judge's discretion and should not be reversed absent an abuse of that discretion. (*In re Marriage of Falat* (1990), 201 Ill. App. 3d 320, 329, 559 N.E.2d 33, 39.) Because defendant knew or should have known that the Esterline charts were relevant to the issues raised in plaintiff's original complaint, we cannot find that defendant was prejudiced or is entitled to a new trial based upon the court's decision to exclude evidence of plaintiff's earlier complaints.

PLAINTIFF'S FUTURE MEDICAL COSTS

Defendant also asserts that the trial court improperly permitted testimony as to the extent of future medical costs to maintain plaintiff's artificial arm.

Millet Kedys, a certified prosthetist, testified as to his treatment of plaintiff after the accident. During his testimony, Kedys stated that the total costs incurred for plaintiff's conventional and myoelectric prostheses to date were $37,569.10. He also testified that the current cost of a myoelectric prosthesis is $39,000. Kedys was also questioned as to the future cost of a myoelectric prosthesis for plaintiff and stated that "[o]ver 46 years, which is [plaintiff's] life expectancy, that is 46 years into the future, is calculated at about $810,262." He explained that the figures for lifetime cost are generated by the manufacturer of the prosthesis using life-expectancy figures taken from tables promulgated by the United States Department of Health. Kedys stated further that the figures for lifetime cost are based on the yearly cost of maintenance, with inflation and the increased cost of components factored in.

Defendant failed to object to this testimony when it was given. Subsequently, when defendant argued during the conference on admission of plaintiff's exhibits that the trial court should not have allowed this testimony before the jury because it was too speculative, the trial court overruled defendant's objection. Defendant's objection to Kedys' testimony was untimely and failed to preserve the issue for review. *Jones v. Consolidation Coal Co.* (1988), 174 Ill. App. 3d 38, 42-43, 528 N.E.2d 33, 36.

Even if this question had been preserved for appeal, we find that the trial court properly admitted the testimony of Kedys. The evidence presented reflected the total costs incurred for plaintiff's conventional and myoelectric prostheses to date, coupled with the evidence of the current cost of a myoelectric prosthesis, and the figures for lifetime cost using life-expectancy figures and the yearly cost of maintenance, with inflation and the increased cost of components factored in. Defendant had ample opportunity to cross-examine Kedys on these figures, and we hold that this evidence provided a sufficient basis for the jury to determine plaintiff's future medical expenses. *Long v. Friesland* (1988), 178 Ill. App. 3d 42, 58, 532 N.E.2d 914, 924.

EXAMINATION OF DEFENDANT'S EMPLOYEES AS ADVERSE WITNESSES

Defendant next contends that the trial court erred in permitting plaintiff to call and examine Kemnitz, the motorman of the train that struck plaintiff, and Moyzis, the CTA policeman called to the scene, as adverse witnesses under section 2—1102 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1102).

Section 2—1102 provides that "[u]pon the trial of any case any party thereto or any person for whose immediate benefit the

action is prosecuted or defended, or the officers, directors, managing agents or foreman of any party to the action, may be called and examined as if under cross-examination at the instance of any adverse party." Ill. Rev. Stat. 1989, ch. 110, par. 2—1102.

Moyzis was never named as a party to the action, and Kemnitz had been voluntarily dismissed by plaintiff on the first day of trial. Neither was an officer, director, managing agent, or foreman of the CTA. Consequently, they did not fall within the express provisions of section 2—1102.

It has been held employees of a party who are not supervisors or managers cannot properly be examined under section 2—1102. (*Karlin v. Inland Steel Co.* (1979), 77 Ill. App. 3d 183, 185, 395 N.E.2d 1038, 1040; *Gillespie v. Norfolk & Western Ry. Co.* (1972), 3 Ill. App. 3d 779, 783-84, 278 N.E.2d 420, 423.) It has also been held, however, that a new trial is not required where the party alleging error cannot establish that it has been prejudiced by the procedure followed by the court. *Mazanek v. Rockford Drop Forge Co.* (1981), 98 Ill. App. 3d 956, 962, 424 N.E.2d 1271, 1277-78; *Gillespie*, 3 Ill. App. 3d at 783-84, 278 N.E.2d at 423.

An error is not reversible unless it has been shown that the error was substantially prejudicial and thereby unduly affected the outcome of the trial. (*Schaffner v. Chicago & North Western Transportation Co.* (1987), 161 Ill. App. 3d 742, 754, 515 N.E.2d 298, 305.) Defendant has failed to establish that it was prejudiced by the plaintiff's examination of Kemnitz and Moyzis under section 2—1102, and we do not find sufficient error to order a retrial of this cause on this basis.

PLAINTIFF'S LOSS OF FUTURE EARNINGS

We next address defendant's assertion that the trial court improperly allowed the introduction of inflammatory and speculative testimony about plaintiff's intention to become an electrician in the future.

Illinois courts have long considered loss of future earnings to be a proper element of damages. (*Singh v. Air Illinois, Inc.* (1988), 165 Ill. App. 3d 923, 520 N.E.2d 852; *Robinson v. Greeley & Hansen* (1983), 114 Ill. App. 3d 720, 449 N.E.2d 250.) Yet, recovery is limited to such loss as is reasonably certain to occur. *Christou v. Arlington Park-Washington Park Race Tracks Corp.* (1982), 104 Ill. App. 3d 257, 432 N.E.2d 920.

In the instant case, over defendant's objection, the trial court permitted plaintiff and his mother to testify as to his plans to become an electrician. At the subsequent conference on jury instruc-

tions, the trial court determined that this evidence was too speculative and refused to issue an instruction on the value of plaintiff's loss of future earnings. Later, the court specifically instructed the jury to disregard any evidence of plaintiff's intention to become an electrician.

An error is not reversible unless it has been shown that the error was substantially prejudicial and thereby unduly affected the outcome of the trial. (*Schaffner*, 161 Ill. App. 3d at 754, 515 N.E.2d at 305.) We will not find reversible error where the trial court refused to issue an instruction on plaintiff's loss of future earnings and admonished the jury to disregard any testimony of his plans to become an electrician.

DETERMINATION OF PLAINTIFF'S COMPARATIVE FAULT

We now turn to the issues raised by plaintiff in his separate appeal. Plaintiff initially asserts that the jury's determination that his comparative fault amounted to 70% was against the manifest weight of the evidence. Plaintiff claims that based upon the testimony of plaintiff, Gullo, Wade, Kemnitz, McAdory, Moyzis, and Zdeb, the jury's verdict with respect to the proportion of negligence attributable to plaintiff should be set aside, and a new trial should be held solely on that issue.

In determining whether a jury verdict should be set aside, a court must decide whether the verdict was against the manifest weight of the evidence. (*Junker v. Ziegler* (1986), 113 Ill. 2d 332, 498 N.E.2d 1135; *Tedrowe v. Burlington Northern, Inc.* (1987), 158 Ill. App. 3d 438, 443, 511 N.E.2d 798.) Where there is evidence in favor of the defendant which, if believed, supports the verdict, the reviewing court should not set aside a jury determination. (*Tedrowe*, 158 Ill. App. 3d at 444, 511 N.E.2d at 801; *Clifton v. Nardi* (1978), 65 Ill. App. 3d 344, 382 N.E.2d 514.) The test is not whether the evidence *could have* supported a verdict for the movant if contrary inferences were drawn, but whether a contrary verdict is clearly evident. *Johnson v. Colley* (1986), 111 Ill. 2d 468, 474, 490 N.E.2d 685, 687-88; *Tedrowe*, 158 Ill. App. 3d at 444, 511 N.E.2d at 801; *Johnson v. Chicago Transit Authority* (1975), 28 Ill. App. 3d 945, 329 N.E.2d 395.

In the instant case, there was conflicting evidence as to whether plaintiff was signalling the motorman to stop just before he fell from the platform. Plaintiff, Gullo, and Wade testified that plaintiff was standing near the edge of the platform, leaning over so that his arm was beyond the edge of the platform, and was wav-

ing his left arm at the driver of the train when he lost his balance and fell from the platform. Kemnitz and McAdory testified that plaintiff was not standing near the edge of the platform and waving his arm. Rather, Kemnitz and McAdory testified that plaintiff walked off the platform as the train entered the station. Moyzis testified that Gullo told him that when she and plaintiff stood to board the train, plaintiff was half asleep and walked over the edge of the platform. The evidence was also in dispute as to when Kemnitz first applied the brakes on the train and as to how fast the train was travelling when it struck plaintiff.

Upon consideration of this conflicting evidence, in addition to all of the other evidence presented at trial, the jury apportioned fault as it deemed proper. The jury heard the witnesses testify, observed their demeanor, and determined their credibility. The determination of what conduct is negligent or contributorily negligent is to be made by the jury. (*Colley*, 111 Ill. 2d at 475, 490 N.E.2d at 688.) There was evidence in favor of the defendant which, if found credible by the jury, supported the verdict, and a contrary verdict was not clearly evident from the evidence presented. Under these circumstances, we do not find that the jury's verdict was against the manifest weight of the evidence or that a new trial should be ordered on this issue.

COMMENTS BY DEFENSE COUNSEL DURING CLOSING ARGUMENT

 Plaintiff next argues that many of the comments made by defense counsel during closing argument were improper, prejudicial, and deprived plaintiff of a fair trial.

Improper, prejudicial closing argument may be grounds for a new trial where the complaining party has been prejudiced and a proper objection was made. (*Cooper v. Chicago Transit Authority* (1987), 153 Ill. App. 3d 511, 523, 505 N.E.2d 1239; *Fraher v. Inocencio* (1984), 121 Ill. App. 3d 12, 15, 459 N.E.2d 11, 13.) However, before a reviewing court will reverse a judgment based upon improper comments during closing argument, it must appear that those comments were clearly improper and prejudicial and prevented the complaining party from receiving a fair trial. (*Cooper*, 153 Ill. App. 3d at 524, 505 N.E.2d 1239; *Ferry v. Checker Taxi Co.* (1987), 165 Ill. App. 3d 744, 750, 520 N.E.2d 733; *Boasiako v. Checker Taxi Co.* (1986), 140 Ill. App. 3d 210, 214, 488 N.E.2d 672, 675.) In determining whether a party has been denied a fair trial based upon allegedly improper argument, a court of review must

consider the trial as a whole. *Cooper,* 153 Ill. App. 3d at 523, 505 N.E.2d 1239.

Plaintiff initially contends that he was deprived of a fair trial because defense counsel improperly insinuated to the jury that plaintiff had been drinking or was intoxicated before the accident. Although plaintiff has cited several cases in support of this contention (*Fraher v. Inocencio* (1984), 121 Ill. App. 3d 12, 459 N.E.2d 11; *Wagner v. Zboncak* (1982), 111 Ill. App. 3d 268, 443 N.E.2d 1085; *Benuska v. Dahl* (1980), 87 Ill. App. 3d 911, 410 N.E.2d 249; *Coleman v. Williams* (1976), 42 Ill. App. 3d 612, 356 N.E.2d 394), these cases are factually distinguishable from the case at bar. In each of these cases, the attorney delivering the closing argument made specific references to drinking, beer cans or beer bottles, or specifically requested the jury to consider the fact that the other party had been in two taverns during five of the six hours preceding the accident.

In the instant case, defense counsel made no direct reference to the plaintiff's consumption of alcohol. Defense counsel made note of the fact that plaintiff and Gullo had been at the blues club for over two hours, and argued that there was no explanation for plaintiff's fall from the platform. Counsel did not, however, represent to the jury that plaintiff had been drinking or intoxicated on the night of the accident. Under these circumstances, we cannot say that the plaintiff was deprived of a fair trial by the closing argument of defense counsel.

Plaintiff also argues that defense counsel improperly implied to the jury that plaintiff was withholding important evidence adverse to the plaintiff and intimated that the plaintiff had committed subornation of perjury and had manufactured evidence.

It has consistently been held that it is reversible error for counsel to create the inference that the opposing party had withheld evidence from the jury which would have been an important factor in its determination of the case. *Forest Preserve District v. Alton R.R. Co.* (1945), 391 Ill. 230, 236, 62 N.E.2d 701; *Crutchfield v. Meyer* (1953), 414 Ill. 210, 111 N.E.2d 142; *L.D. Brinkman & Co.—Midwest v. National Sponge Cushion Co.* (1979), 76 Ill. App. 3d 683, 695, 394 N.E.2d 1221.

It is also error for counsel to attack the integrity of the opposing party or his counsel and to imply that evidence had been manufactured. *Manninger v. Chicago & Northwestern Transportation Co.* (1978), 64 Ill. App. 3d 719, 729-30, 381 N.E.2d 383; *Thomas v. Dalpos* (1975), 26 Ill. App. 3d 877, 883, 326 N.E.2d 42.

▆▆ In support of his claim, plaintiff points to the argument by defense counsel which made reference to the fact that plaintiff had never offered evidence of a reason or an explanation for his fall from the platform. Defense counsel also argued that although the jury was entitled to know exactly what happened on the night of the accident, the jury had never been told precisely what happened and why plaintiff fell from the train platform. We do not believe that these comments can be considered sufficiently improper under the standards set forth above to require a new trial of this cause.

▆▆ ▆ Plaintiff next asserts that defense counsel improperly misstated facts and testimony, employed tactics to confuse the jury and to arouse its sympathy for defendant. In support of this claim, plaintiff points to those portions of defense counsel's argument where he addressed individual jurors by name; misrepresented the testimony of Gullo; argued his personal beliefs to the jury; and led the jury to believe that the four individual CTA employees who had testified were defendants to the action and had been charged with willful and wanton misconduct.

Plaintiff's attorney objected to defense counsel's reference to individual jurors by name, and the trial court sustained the objection. Consequently, plaintiff cannot claim that he was prejudiced by these comments. (*People v. Moody* (1990), 199 Ill. App. 3d 455, 466, 557 N.E.2d 335, 342.) Counsel is allowed to comment on the evidence introduced and to draw reasonable inferences therefrom. (*Forest Preserve District*, 391 Ill. at 236, 62 N.E.2d at 704; *Schwedler v. Galvan* (1977), 46 Ill. App. 3d 630, 641-42, 360 N.E.2d 1324.) Upon review of the remaining comments within the context of the applicable case law, we hold that these comments were not sufficiently improper to warrant a reversal and a new trial.

EVIDENCE OF COMMENDATIONS RECEIVED BY THE MOTORMAN

Plaintiff also argues that the trial court erred in allowing defendant to present evidence of commendations previously received by the motorman of the train which struck plaintiff.

▆▆ It has been held that where the likelihood of prejudicial effect is great, the violation of an order *in limine* excluding certain evidence may constitute reversible error. *Shehy v. Bober* (1979), 78 Ill. App. 3d 1061, 398 N.E.2d 80, 86.

Plaintiff asserts that defendant should have been precluded from presenting evidence of Kemnitz' commendations because they had not been previously produced during pretrial discovery. Defendant argues, however, that the entire personnel files of Kemnitz and

McAdory were made available to plaintiff's counsel, but plaintiff's attorney chose only to copy certain documents in Kemnitz' personnel file. Defendant argues further that the documents were relevant to the willful and wanton entrustment claim and were properly admitted by the court.

 The record reveals that plaintiff's counsel failed to object to Kemnitz' testimony as to his commendations at the time it was given. Rather, counsel waited until the following day and argued, out of the presence of the jury, that this evidence violated the court's order *in limine* excluding any documents not previously produced. When Kemnitz testified about his awards, plaintiff's counsel did not claim surprise and did not request a continuance, however short, in order to adequately prepare for cross-examination on this topic. This evidence was relevant to the willful and wanton entrustment claim, and it does not appear that plaintiff was prejudiced in any way by its admission. Consequently, we hold that plaintiff was not deprived of a fair trial by the admission of this evidence.

EXCLUSION OF WITNESSES

Plaintiff next asserts that the court's order *in limine* excluding witnesses was violated by a conversation between two CTA employees which took place during the trial.

The record indicates that plaintiff and defendant mutually agreed upon an order *in limine* excluding all witnesses from the courtroom during the course of the trial. Plaintiff has asserted that this order was violated by a conversation between Kemnitz and Moyzis which took place outside the courtroom during a recess after Kemnitz had testified but before Moyzis had been called to the stand.

 Illinois courts have long held that the exclusion of witnesses from the courtroom during trial is an appropriate device to preclude one witness from shaping his testimony to conform to that of those who have already testified. (*People v. Johnson* (1977), 47 Ill. App. 3d 362, 369, 362 N.E.2d 701, 706.) Yet, a violation of an exclusion order does not necessarily result in the automatic disqualification of the witness. (*Johnson*, 47 Ill. App. 3d at 369, 362 N.E.2d 701.) It is within the discretion of the trial judge whether a witness who has violated an exclusion order should be permitted to testify. (*People v. Gibson* (1969), 42 Ill. 2d 519, 525, 248 N.E.2d 108; *Johnson*, 47 Ill. App. 3d at 369, 362 N.E.2d at 701.) This rule is predicated upon the theory that an innocent litigant should not be punished by deprivation of testimony material to his case because a

witness, without the party's knowledge or fault, has violated the exclusion order of the court. *People v. Viskniskki* (1912), 255 Ill. 384, 99 N.E. 621; *Johnson*, 47 Ill. App. 3d at 369, 362 N.E.2d 701.

■■■ Plaintiff has argued that the conversation between Kemnitz and Moyzis was potentially prejudicial to the plaintiff. This argument is not, however, supported by the record. The trial court questioned each of the witnesses as to the substance of their conversation during the recess of the trial. Neither of the witnesses testified that they had discussed the merits of the case or their testimony.

Both Kemnitz and Moyzis were material to the defendant's case, and there is nothing in the record to indicate that their conversation occurred through any fault or wrongdoing on the part of the defendant. Kemnitz had already completed his testimony, and there is no evidence in the record establishing that Moyzis had deliberately altered or shaped his testimony to conform to that of Kemnitz. Based upon these circumstances, we do not believe that the trial court abused its discretion in allowing the testimony of both witnesses to stand. Moreover, plaintiff has not suggested what sanction should have been imposed by the trial court. Clearly, the testimony of Kemnitz, which had been concluded before the conversation with Moyzis took place, was critical to defendant's case and should not have been stricken or excluded by the court. The testimony of Moyzis was less critical and had not been concluded prior to the conversation. Yet, as noted above, there is no indication from the record that Moyzis had deliberately altered or shaped his testimony to conform to that of Kemnitz, and plaintiff did not request that the testimony of Moyzis be stricken. Consequently, we hold that the trial court acted properly in allowing the jury to consider the testimony of both witnesses.

ISSUANCE OF ILLINOIS PATTERN JURY INSTRUCTION 5.01

■■■ ■ Finally, plaintiff contends that the trial court erred in refusing to issue Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971) (IPI Civil 2d), which allows the jury to draw an adverse inference from a party's failure, without reasonable excuse, to produce evidence in that party's control and not equally available to the other party.

Plaintiff maintains that this instruction would have permitted the jury to infer that the information contained in the Esterline charts would have been adverse to the defendant because (1) the Esterline charts were under the control of the defendant and could

have been produced by the exercise of reasonable diligence; (2) the charts were not equally available to the plaintiff; (3) a reasonably prudent person under the same or similar circumstances would have offered the evidence if he believed it to be favorable to him; and (4) no reasonable excuse for the failure to present the Esterline charts had been shown. Plaintiff argues that a different result may have been obtained if this instruction had been given. Yet, this is not the appropriate standard of review.

The giving of this instruction is within the sound discretion of the trial court, and a reviewing court will reverse only where there has been a clear abuse of that discretion. *Roeseke v. Pryor* (1987), 152 Ill. App. 3d 771, 504 N.E.2d 927; *Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 462 N.E.2d 645; *Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 1046-47, 460 N.E.2d 464; *Hicks v. Hendricks* (1975), 33 Ill. App. 3d 486, 493, 342 N.E.2d 144.

The record in the instant case does not support a finding of a clear abuse of discretion by the trial court in refusing to issue this instruction. Both parties submitted IPI 5.01, and the record reveals an extensive discussion by the parties and the court at the instruction conference over the propriety of issuing this instruction for either party. The trial court concluded that neither party had presented sufficient basis to warrant the issuance of the instruction. Defendant has consistently and vigorously argued that the Esterline charts were not specifically requested by plaintiff until 1985, well after they had already been destroyed. Based upon the facts appearing in this record, we cannot say that it was a clear abuse of discretion for the trial court to refuse IPI Civil 2d No. 5.01 on behalf of plaintiff.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

RAKOWSKI, P.J., and McNAMARA, J., concur.